IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Robert Fischer and Stephanie Lukis, individually and on behalf of all others similarly situated, | ) ) ) ) | CIVIL ACTION NO: 19-cv-4892 |
| *Plaintiffs,* | ) ) | JUDGE FEINERMAN |
| v. | ) ) | MAG. WEISMAN |
| Instant Checkmate LLC, | ) ) | |
| *Defendant.* | ) | |

---

### OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
---

Plaintiffs submit the following opposition to Defendant Instant Checkmate's motion to dismiss.

1. **The substance of Plaintiff's complaint.**

Plaintiffs allege that Defendant obtains information sufficient to identify them to a reasonable viewer and then uses that information to advertise Defendant's services on its website. Compl. ¶¶ 8-12. Specifically, Defendant provides website viewers with a preview of Plaintiffs' identifying information as part of advertisements for Defendant's "background report services." Compl. ¶¶ 12-14. These services consist of paid subscriptions that allow users access to the background reports of all individuals in Defendant's database, including Plaintiffs. Compl. ¶¶ 15-16. Plaintiffs allege that this conduct violates the Illinois Right of Privacy Act ("IRPA") because Instant Checkmate uses Plaintiffs' identities "for a commercial purpose" as defined in 765 ILCS 1075/5.

2. ***Dobrowolski v. Intelius, Inc*., No. 17- cv-1406, slip op. (N.D. Ill. May 21, 2018).**

Because much of Instant Checkmate's motion is argued in the shadow of *Dobrowolski*, Plaintiffs begin with their interpretation of that case. There, the plaintiffs alleged that defendants paid Google to display advertisements within Google's search results when someone entered a particular name into the Google search engine. *Id*. at 2. The Google search result link led to a "marketing page" on defendants' websites which displayed identifying information about the plaintiffs and other people with the same

name. *Id*. A user of the defendants' websites could then elect to purchase "informational reports" about any of the individuals who showed up on the marketing page. *Id*. at 1-2. The *Dobrowolski* court found these facts insufficient to state an IRPA claim because (1) the defendants were only using plaintiffs identities to advertise the sale of the plaintiffs' "informational reports" (as opposed to advertising a separate product); and (2) because it was impossible to say which of the identically-named individuals on defendants' marketing page—if any—the paid Google search result was advertising on behalf of. *Id*. at 5.

Despite Instant Checkmate's reliance on *Dobrowolski*, there are some fundamental differences between that case and this one—one of which Your Honor highlighted in the notice-of-motion hearing. Unlike in *Dobrowolski*, Instant Checkmate advertises *other* services—its background report services—using Plaintiffs' identities. In other words, it puts Chance the Rapper on the cover of Judge Feinerman's biography because the judge saw him in concert one time. This makes the instant case different from *Dobrowolski* as well as *Thompson v. Getty Images, Inc*., 2013 WL 3321612 (N.D. Ill. July 1, 2013), because in those cases the defendants were using plaintiff's identity to "preview" a product relating only to the plaintiff.

The second difference between *Dobrowolski* and this case is that Plaintiffs are not complaining about a paid advertisement in Google's search results—they are complaining that searches conducted on Defendant's own website yield "advertising previews" that allow the viewer to specifically identify the Plaintiff and class members. As shown in Paragraph 10 of the complaint, entering the name "Robert Fisher" or "Stephani Lukis" into Defendant's website yields search results which provide age, middle initials, last cities of domicile, and possible relatives. In *Dobrowolski* it was impossible to say on whose behalf the paid Google search result was made. By contrast, each search result on Instant Checkmate's website is clearly made on behalf of a distinct person. In short, in *Dobrowolski* the advertisement was the Google search result; in this case the advertisement is the advertising preview on Defendant's own website.

Plaintiff now turns to Instant Checkmate's enumerated arguments.

1. "**Exemption One" does not apply to Defendant's conduct.**

Instant Checkmate claims that its use of Plaintiff's identity does not violate IRPA because the background reports advertised on its website are akin to books, articles, or other visual works as defined in 765 ILCS 1075/35(b)(1). As an initial matter, Plaintiff's complaint identifies the *advertisement* for the background report as violating IRPA—not the background report itself—so the proper question is whether the advertisement is exempt under Subsection (b)(1). It is not, because it cannot seriously be considered "a live performance, a single and original work of fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-visual work[.]"

Instant Checkmate asks the Court to interpret the term "work" broadly, calling its website content a "book, article, or other visual work." But this interpretation of (b)(1) is overly expansive and would leave the statute with little meaning. By the principle of *noscitur a sociis* the word "work" is referring to artistic endeavors e.g., theatre, music, film, or writing.[1] Journalism (or a phonebook or a Who's Who) might sometimes occur as a "book" or "article," but fits more appropriately under the exemption found in subsection (b)(2) as "news" or "public affairs." In any case, Subsection (b)(1) was certainly not intended to apply to advertisements for background reports;[2] and if (b)(1) is interpreted that expansively it is difficult to imagine any material that would *not* be excepted from IRPA—because all representations must be either written or "audio-visual work."

Even if the term "work" were meant to include any spoken or recorded word, in order for (b)(1) to apply the "work" must not "constitute in and of itself constitute a commercial advertisement." *Id*. Here, the very basis of Plaintiffs' lawsuit is that the "work" at issue i.e. the advertisement page soliciting

---

[1] This interpretation of Subsection (b)(1) is further informed by the language prohibiting "use of an individual's identity in an *attempt* to *portray*, *describe*, or *impersonate* [an] individual…" (emphasis added). Again, in the context of the entire subsection, these verbs indicate that the exemption was designed to apply to artistic and/or creative endeavors—not background reports listing someone's "possible relatives" or previous cities of domicile.

[2] As Instant Checkmate's own brief observes, "IRPA's exemptions [were designed] to protect the First Amendment interest of individuals, *such as artists and reporters*." Def.'s Br. at 4 (quoting HB 1422, Tr. of House Debate, 90th Ill. Gen. Assem. (April 24, 1997) at 226) (emphasis added).

purchase of a background report, is using unlawfully using Plaintiffs' identities. Thus Subsection (b)(1) still should not apply.

### 2. "Exemption Two" does not apply to Defendant's conduct.

Instant Checkmate next argues that Subsection (b)(2) of IRPA applies, because it is using Plaintiffs' identities for a "non-commercial purpose" that concerns "news" or "public affairs." Yet this is another forced reading of the statute. First, as argued above, the fundamental premise of this lawsuit is that Defendant solicits its products and services by using Plaintiffs' identities on instantcheckmate.com. That is about as "commercial purpose" as it gets. Defendant's motion does not tell us how it is *not* a commercial purpose—except to suggest that Defendant is merely a beneficent sharer of public information and whether a user of their website happens to purchase services after seeing the partial details of Plaintiffs' identities is purely incidental. But that means this case should still move past a Rule 12 challenge, because the lawsuit alleges that Defendant displays Plaintiffs' identities for a commercial purpose, not a non-commercial one. Compl. ¶¶ 12-13. For these reasons alone, Defendant's (b)(2) argument should be denied.

Defendant cites to *Nieman v. Versuslaw, Inc*., 2012 WL 3201931 (C.D. Ill. Aug. 3, 2012), aff'd, 512 F. App'x 635 (7th Cir. 2013), but that case is different than this one. First, the court there specifically found that "[plaintiff's] name is *not* being held out or used to entice anyone to buy a product." *Id*. at *4. (Emphasis added). Here, as shown above, the opposite is true. Second, in *Nieman* the plaintiff's identity was used to identify him as a participant in civil litigation. *Id*. By contrast, Instant Checkmate provides Plaintiffs' previous cities of domicile and lists their relatives. It would difficult—and in some cases impossible—for anyone to determine Plaintiffs' past addresses or certain relatives from purely public documents.

### 3. "Exemption Four" does not apply to Defendant's conduct.

Defendant's third argument is that because Exemptions One and Two apply to the background reports offered through their website, Exemption Four allows for the advertisement of those reports. The problem with this argument is that, as stated above, Defendant's background reports are not a "work,"

under Subsection (b)(1). Additionally, the background reports do not serve any "non-commercial purposes" under Subsection (b)(2)—they exist for the sole purpose of generating revenue for Defendant Instant Checkmate. For these reasons Instant Checkmate's (b)(4) argument fails.

### 4. The First Amendment does not protect Instant Checkmate's conduct.

Instant Checkmate claims its conduct is protected by the First Amendment because its use of Plaintiffs' identities is an example of "non-commercial speech." Yet Defendant's website advertises the partial background reports of individuals for the sole purpose of enticing website users to purchase background report services. Compl. ¶¶ 12-13. This is clearly "speech that proposes a commercial transaction." *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 482 (1989). "[T]he Seventh Circuit has listed relevant considerations to include "whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *U.S. v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009). Here, Defendant's website specifically solicits the purchase of its products—subscription background report services—through an advertisement that teases portions of Plaintiffs' identity. Thus, it meets all three factors from *Benson*.

Defendant analogizes this case to *Vrdolyak v. Avvo, Inc.*, 206 F. Supp. 3d 1384 (N.D. Ill. 2016), arguing that like the website in *Vrdolyak*, Defendant's website is merely a "directory." But *Vrdolyak* involved very different facts. In that case the defendant compiled identifying information about U.S. attorneys and displayed that information in a profile page for each attorney on defendant's website. *Id*. at 1386. The information on each attorney profile page was displayed *for free* alongside advertisements for third-party services. *Id*. The *Vrdolyak* plaintiff conceded that the attorney profile information was constitutionally protected—but he argued the addition of the third-party advertisements converted the entire profile page into an advertisement, making it all commercial speech. *Id*. at 1388. The court ultimately found that the profile pages were not commercial speech by virtue of the third-party advertisements because (1) not every profile page had an advertisement; and (2) the advertisements did not name the attorneys shown in the profile pages where they were displayed. *Id*. The court rightly

5

observed that to hold otherwise would create liability for virtually all publishers, who commonly gain revenue by including third-party advertisements alongside their content. *Id*.

In the present case, Defendant's so-called "directory" is not freely available to any website user, as in *Vrdolyak*, but instead is teased as part of Defendant's advertising strategy with information about Plaintiffs' identities. Defendant does not post third-party advertisements alongside Plaintiffs' identifying information; it advertises its own, for-pay services. The website in *Vrdolyak* was like a phonebook for lawyers with a pizza restaurant advertised in the margins; the website in this case is like a phonebook for lawyers that lists names and addresses—but makes you pay extra if you want to see the phone numbers. That makes this case less like *Vrdolyak* and more like *Gabiola v. Sarid*, 2017 WL 4264000 (N.D. Ill. Sept. 26, 2017). In *Gabiola*, the defendant's website published mugshot photos and arrest records of the plaintiffs and required users to pay a fee to remove them. *Id*. at 2-3. The *Gabiola* court distinguished *Vrdolyak* by observing that unlike the passive display of third-party advertisements alongside the defendant's website content, the *Gabiola* defendants incorporated the plaintiffs' identities into the advertisements for their own services. *Id*. at 6. The "[plaintiffs'] profiles…work together with links directly to the checkout page…as advertisements [for defendant's services]." *Id*.

**5. Conclusion**

IRPA was not just written for the rich and famous. "This legislation will help protect entertainers, celebrities such as Michael Jordan, as well as other ordinary people…people who do not wish to have their identities used in the commercial manner without their consent." HB 1422, Tr. of House Debate, 90th Ill. Gen. Assem. (April 24, 1997) at 225. It is hard to imagine another venture that more baldly commercializes a regular person's identity than the Defendant's website. Unless IRPA is dead-letter law it should apply here.

*Respectfully submitted,*

*/s/ Roberto Luis Costales*

_____

Roberto Luis Costales
William H. Beaumont
BEAUMONT COSTALES
107 W. Van Buren #209
Chicago, IL 60605
Telephone: (773) 831-8000
rlc@beaumontcostales.com
Attorneys for Plaintiff