UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FISCHER, STEPHANIE LUKIS, and TIFFANY ADAMS, individually and on behalf of all others similarly situated, | ) | 19 C 4892 |
| Plaintiffs, | ) | Judge Gary Feinerman |
| vs. | ) | |
| INSTANT CHECKMATE LLC, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Robert Fischer and Stephanie Lukis brought this putative class action against Instant Checkmate LLC in the Circuit Court of Cook County, alleging violations of the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq*. Doc. 1-1. Instant Checkmate removed the suit under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Doc. 1. Last year, the court denied Instant Checkmate's motion to dismiss, Docs. 35-36 (reported at 454 F. Supp. 3d 746 (N.D. Ill. 2020)), and later denied its motions for reconsideration, leave to appeal, and summary judgment, Docs. 88-89 (reported at 2020 WL 6287369 (N.D. Ill. Oct. 27, 2020)). Plaintiffs then amended their complaint to add Tiffany Adams as a named plaintiff. Doc. 109. Instant Checkmate moves under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., to compel arbitration of Adams's claim. Doc. 141. The motion is granted.

**Background**

On a motion to compel arbitration, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in [her] favor." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (internal quotation marks omitted).

Adams joined this suit on December 3, 2020. Doc. 109. At that time, discovery as to Lukis's and Fischer's claims was ongoing, and in a joint status report filed days later, the parties "agree[d] that by providing discovery to the original Plaintiffs, [Instant Checkmate] does not waive any rights to raise issues of arbitrability with respect to the newly added Plaintiff[]." Doc. 112 at 2. Instant Checkmate answered the amended complaint on December 17, asserting arbitrability as a defense. Doc. 119 at 17.

On January 13, 2021, Instant Checkmate sent Adams an informal discovery request for "all email addresses" she used. Doc. 142-2 at 5. Adams responded days later with one email address. *Id*. at 2. On January 26, Andrew Johnson, a senior software engineer at Instant Checkmate's parent company, searched Instant Checkmate's user database for that address. Doc. 142-11 at ¶ 9. His search revealed that, on August 21, 2013, Adams had entered her name and email address into a registration form on the Instant Checkmate website. *Ibid*.

Adams does not seriously contest this fact. Granted, Adams avers that she "do[es] not recall" going to the website or completing the form in 2013. Doc. 152-1 at ¶ 3. But in opposing the motion to compel, Adams does not contend that Instant Checkmate's records reflecting that she *did* complete the form are inaccurate or unreliable. Doc. 152 at 6-7 & n.6. There accordingly is no dispute that Adams entered her name and email on a registration form on the website.

Johnson's declaration provides "a screenshot of a webpage materially identical to the page … Adams would have seen on August 21, 2013," Doc. 142-11 at ¶ 9, which is reproduced below. The webpage states that "Information on John Doe is Available" and urges the user to "[s]ign up below to gain full access to your report on John Doe." *Ibid*. It then asks the user to enter her first name, last name, and email address in certain fields. *Ibid*. Immediately below

those fields, there is a large button labeled "CONTINUE." *Ibid*. Below that button, in a smaller font, the page states: "Already a member? Click here to login." *Ibid*. Finally, beneath a gray line in italicized text, the page states: "By clicking 'Continue' you represent that you are over 18 years of age and have agreed to our terms of use, privacy policy, and limited license for services and you agree to receive email from InstantCheckmate.com." *Ibid*. The words "terms of use" are in blue text—and Johnson avers that clicking that text activated a hyperlink to Instant Checkmate's Terms of Use. Doc. 157-1 at ¶ 3.

Adams argues that this screenshot is inadmissible because Instant Checkmate does not show that Johnson has the requisite personal knowledge to authenticate it. Doc. 152 at 8-9. Evidence Rule 901 states: "To satisfy the requirement of authenticating or identifying an item of

evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "Authentication can be established in a variety of ways, including by '[t]estimony of [a] witness with knowledge … that a matter is what it is claimed to be[,]' Rule 901(b)(1), and by distinctive characteristics such as '[a]ppearance, contents, substance, [or] internal patterns … taken in conjunction with circumstances[,]' Rule 901(b)(4)." *United States v. Dumeisi*, 424 F.3d 566, 574 (7th Cir. 2005) (alterations in original).

Johnson's first declaration states that he started work as a software engineer with Instant Checkmate's parent company in May 2015, Doc. 142-11 at ¶¶ 1-2, and provides little foundation for his knowledge of how the website appeared in August 2013. After Adams objected to the screenshot's admission, Instant Checkmate submitted another declaration from Johnson, in which he avers: "In my role as a Software Engineer, I regularly review and maintain records associated with users' historic and current use of the Instant Checkmate website. I also regularly review and maintain records associated with the historic and current design of the Instant Checkmate website." Doc. 157-1 at ¶ 1. Johnson further avers that "Instant Checkmate has limited historical screenshots of the website." *Id*. at ¶ 4.

The screenshot is sufficiently authenticated under Rule 901. First, its "appearance" and "contents" tend to suggest that it is genuine, Fed. R. Evid. 901(b)(4), as Instant Checkmate sells its background reports through a subscription service, Doc. 66 at ¶ 8, and, consistent with that fact, the webpage advertises reports "at the low price of $9.86/mo," Doc. 142-11 at ¶ 9. Moreover, Johnson's second declaration adequately establishes his personal knowledge of the screenshot's authenticity. *See* Fed. R. Evid. 901(b)(1). Website screenshots demand "authentication by someone with personal knowledge of reliability of the archive service from which the screenshots were retrieved." *Specht v. Google Inc.*, 747 F.3d 929, 933 (7th Cir. 2014).

Johnson's first declaration may not have cleared that bar, but his second declaration establishes that he "review[s] and maintain[s]" Instant Checkmate's records of its past website designs. Doc. 157-1 at ¶ 1. That suffices to establish his knowledge of the reliability of Instant Checkmate's website archive. *See Achey v. BMO Harris Bank, N.A.*, 64 F. Supp. 3d 1170, 1176 (N.D. Ill. 2014) (holding that a loan servicer employee "familiar with [the servicer's] record-keeping systems" could authenticate loan documents).

Admissible evidence therefore shows that, when Adams entered her name and email on a registration form on Instant Checkmate's website in August 2013, the webpage stated that clicking "Continue" constituted acceptance of Instant Checkmate's Terms of Use. (Whether that language had legally binding force will be addressed below.) The Terms of Use at that time included this arbitration agreement:

> YOU UNDERSTAND AND AGREE THAT ALL CLAIMS, DISPUTES OR CONTROVERSIES BETWEEN YOU AND Instant Checkmate, ITS PARENTS, AFFILIATES, SUBSIDIARIES OR RELATED COMPANIES, INCLUDING, WITHOUT LIMITATION, TORT AND CONTRACT CLAIMS, CLAIMS BASED UPON ANY FEDERAL, STATE OR LOCAL STATUTE, LAW, ORDER, ORDINANCE OR REGULATION, AND THE ISSUE OF ARBITRABILITY, SHALL BE RESOLVED BY THE FINAL AND BINDING ARBITRATION PROCEDURES SET [FORTH] BELOW.

Doc. 142-8 at 4, § 11(a). On the question whether arbitrability questions are committed to the court or the arbitrator, the agreement reiterated: "ANY CONTROVERSY CONCERNING WHETHER A DISPUTE IS ARBITRABLE SHALL BE DETERMINED BY THE ARBITRATOR AND NOT BY THE COURT." *Ibid*. Instant Checkmate also submits two more recent versions of its Terms of Use, published in 2017 and 2018. Docs. 142-9, 142-10. The more recent versions include similar arbitration agreements, though of a far more limited scope, requiring arbitration only of claims related to the use of Instant Checkmate's website. Doc. 142-9 at 15, § 17(a); Doc. 142-10 at 15, § 17(a).

Returning to the course of this litigation, on February 19, 2021, the parties filed a status report in which Instant Checkmate stated that its "investigation to determine whether it has potential arbitration defenses against … Adams is ongoing." Doc. 121 at 4. That day, Instant Checkmate served written discovery requests on Adams, which it described as "limited solely to information necessary to evaluate Instant Checkmate's potential arbitration rights with respect to Adams." Doc. 142-3 at 2. On March 29, Adams responded with, among other things, a web activity report showing that she visited the Instant Checkmate website on April 24, 2017, December 21, 2017, and July 11, 2019. Doc. 142-1 at ¶ 6; Doc. 147. Instant Checkmate moved to compel arbitration three weeks later. Doc. 141.

**Discussion**

Section 2 of the FAA states, in relevant part:

> A written provision in any … contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 "mandates enforcement of valid, written arbitration agreements," *Tinder*, 305 F.3d at 733, and "embodies both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract," *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (internal quotation marks omitted). That said, "because arbitration is a matter of contract, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Ibid*. (internal quotation marks omitted). Accordingly, "[u]nder the FAA, arbitration should be compelled if three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

## I. Waiver

Adams first argues that Instant Checkmate, through its delay in filing the present motion, waived its right to compel arbitration. Doc. 152 at 7-8. "Like any other contractual right, the right to arbitrate can be waived." *Smith v. GC Servs. L.P.*, 907 F.3d 495, 499 (7th Cir. 2018); *see also Auto. Mechs. Loc. 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 746 (7th Cir. 2007) ("[T]he choice of an arbitral forum can be waived early in the proceedings, and generally is waived once the party who later wants arbitration chooses a judicial forum."). "A waiver can be express or implied through action. Either way, the question is whether 'based on all the circumstances, the party against whom the waiver is to be enforced has acted inconsistently with the right to arbitrate.'" *Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 891 (7th Cir. 2020) (citation omitted) (quoting *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002)).

Instant Checkmate has not acted inconsistently with its right to arbitrate Adams's claim. Adams joined the litigation via an amended complaint on December 3, 2020. Doc. 109. Since then, Instant Checkmate's sole focus as to Adams has been to redirect her claim to arbitration. In a joint status report filed in the immediate wake of the amended complaint, the parties agreed that Instant Checkmate could provide discovery to the original plaintiffs without waiving its right to seek arbitration of Adams's claim. Doc. 112 at 2. Instant Checkmate then requested Adams's email address to investigate whether she had registered on its website, discovering on January 26, 2021 that she had done so in August 2013. Doc. 142-11 at ¶ 9.

Adams argues that Instant Checkmate at that time should have moved to compel arbitration but that it instead waited until April 16, after the close of fact discovery, to do so. Doc. 152 at 7-8. During that time frame, however, Instant Checkmate continued its exclusive focus on arbitrability. In a joint status report on February 19, Instant Checkmate stated that its

investigation as to arbitration was ongoing. Doc. 121 at 4. That day, it served formal discovery requests on Adams, each related to arbitration rather than the merits of her IRPA claim. Doc. 142-3 at 6-9. On February 26, Instant Checkmate served objections to Plaintiffs' Rule 30(b)(6) deposition notice, in which it reiterated that it was preserving its right to seek arbitration of Adams's claim. Doc. 142-4 at p. 4, ¶ 10. Adams responded to Instant Checkmate's written discovery requests on March 29, Doc. 142-5, and Instant Checkmate moved to compel arbitration less than three weeks later, Doc. 141.

None of Instant Checkmate's actions between December 2020, when the amended complaint was filed, and mid-April 2021, when it moved to compel arbitration, "manifested an intention to resolve the dispute through the processes of [this] federal court." *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995). To the contrary, Instant Checkmate did "all it could reasonably have been expected to do to make the earliest feasible determination of whether to proceed judicially or by arbitration." *Smith*, 907 F.3d at 499 (quoting *Cabinetree*, 50 F.3d at 391). There was no waiver.

This case stands in sharp contrast to *Lukis v. Whitepages Inc.*, 2021 WL 1600194 (N.D. Ill. Apr. 23, 2021), where the court held that an IRPA defendant in a similar case had waived its right to arbitrate the claim of one of the plaintiffs there, Stephanie Lukis. *Id*. at *7-9. In this case, as to Adams, Instant Checkmate focused single-mindedly on the arbitration issue from the moment that she joined the litigation. Its discovery requests were narrowly focused on that issue, and it never asked this court to rule on any motion relating to the merits of Adams's claim. In *Lukis*, by contrast, Whitepages engaged in general discovery on Lukis's claim, including oral discovery, and it "filed and the court expended considerable resources deciding two dispositive motions concerning the merits of [the] suit." *Id*. at *9. As the court explained in detail,

Whitepages took those actions despite having possessed the records needed to support its arbitration defense. *Id*. at *7. In sum, when it came to preserving its right to seek arbitration, Instant Checkmate did everything right as to Adams's claim, while Whitepages substantially and unjustifiably delayed its motion to compel arbitration of Lukis's claim.

## II. Merits

Turning to the merits of Instant Checkmate's motion, courts "evaluate agreements to arbitrate under the same standards as any other contract," *Tinder*, 305 F.3d at 733, which include "all general principles of state law," *Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 791 (7th Cir. 2013). In particular, "[t]o determine whether a contract's arbitration clause applies to a given dispute, federal courts apply state-law principles of contract formation." *Gore*, 666 F.3d at 1032; *see also Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809 (7th Cir. 2011) ("Whether the parties have validly agreed to arbitrate is governed by state-law principles of contract formation."). The parties agree that Illinois law governs the issue of contract formation, Doc. 142 at 9-10; Doc. 152 at 2 n.1; Doc. 157 at 6 n.1, so the court will apply Illinois law.

"Formation of a contract requires mutual assent in virtually all jurisdictions; Illinois courts use an objective approach to that question." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). As applied to online contracting, the question becomes "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." *Ibid*. The inquiry is an objective one, measured from the perspective of "a reasonable person in [the consumer's] shoes." *Id*. at 1035; *see also Urb. Sites of Chi., LLC v. Crown Castle USA*, 979 N.E.2d 480, 496 (Ill. App. 2012) ("Generally, it is the objective manifestation of intent that controls whether a contract has been formed. The subjective understanding of the parties is not required in order for there to be a meeting of the

minds.") (citation omitted). Because the test is objective, "a party to an internet transaction may lack actual knowledge of additional terms and conditions, [but] nonetheless have constructive knowledge of those terms where the website provides clear and conspicuous notice of them." *Wilson v. Redbox Automated Retail, LLC*, 448 F. Supp. 3d 873, 882 (N.D. Ill. 2020).

Although Adams apparently visited the Instant Checkmate website several times in recent years, Doc. 147, Instant Checkmate moves to compel arbitration based only on her completing a registration on the website in 2013, Doc. 142 at 10-11. Adams retorts that no contract formed between her and Instant Checkmate because the 2013 webpage did not reasonably communicate that users who registered were assenting to the Terms of Use. Doc. 152 at 1-7.

Whether a website gives adequate notice of its terms of use is "a fact-intensive inquiry" turning the specifics of the website at issue. *Sgouros*, 817 F.3d at 1034-35. In *Sgouros*, the Seventh Circuit held that no contract had formed because "the web pages on which [the user] completed his purchase contained no clear statement that his purchase was subject to *any* terms and conditions of sale." *Id*. at 1035. The terms were available on the webpage, but nothing on the page informed the user that clicking through signified assent to the terms. *Ibid*. In so holding, the Seventh Circuit distinguished *Hubbert v. Dell Corp.*, 835 N.E.2d 113 (Ill. App. 2005), which held that a contract had formed where the website stated that "[a]ll sales are subject to [the vendor's] Term[s] and Conditions of Sale" and those terms were hyperlinked on each page. *Id*. at 121-22.

*Sgouros* and *Hubbert* turn primarily on whether the webpage explicitly told the user that she was agreeing to the terms by taking a specified action—in those cases, by making a purchase. Instant Checkmate's registration page satisfied that criterion, as it stated: "By clicking 'Continue' you represent that you … have agreed to our terms of use … ." Doc. 142-11 at ¶ 9.

Adams argues that the webpage nonetheless failed to deliver reasonable notice of the Terms because: (1) that statement was below the "Continue" button rather than above it; (2) users were not told to read the fine print below; and (3) other elements of the webpage, such as a gray line between the button and the text, discouraged users from reading onward. Doc. 152 at 3-4. In support, Adams cites the district court's decision in *Wilson*, which held that extra graphics between a "Pay Now" button and the disclosure that clicking "Pay Now" constituted assent to terms of use "ha[d] the effect of diverting the customer's attention from the Terms of Use and accompanying disclosure." 448 F. Supp. 3d at 884. Even granting that *Wilson* was correctly decided, no categorical rule prohibits providing notice of terms of service below rather than above the part of the webpage on which the user clicks. For instance, *Acaley v. Vimeo, Inc.*, 464 F. Supp. 3d 959 (N.D. Ill. 2020), held that a contract formed even though the phrase "[b]y continuing I agree to the terms" appeared in small font below the button to continue the registration process. *Id*. at 963, 966.

In the end, decisions addressing differently constructed websites do not answer the dispositive question: "whether the circumstances support the assumption that the [user] receive[d] reasonable notice of [the] terms." *Sgouros*, 817 F.3d at 1034. Here, the answer is yes. The disclosure of the Terms of Use was certainly not the most prominent feature of Instant Checkmate's registration webpage, but the page provided reasonable notice, unambiguously referring to the Terms in legible text and providing easy access for users who cared to read further. As in the pre-digital world, internet users "are free to sign legal documents without reading them, but the documents are binding whether read or not." *Novitsky v. Am. Consulting Eng'rs, L.L.C.*, 196 F.3d 699, 702 (7th Cir. 1999). When Adams entered her information on the registration form and clicked "Continue," she assented to the Terms.

The court holds only that Adams assented to the arbitration agreement found in the 2013 version of the Terms of Use; it does not hold that her claim falls within the agreement's scope, as the agreement delegates that arbitrability issue to the arbitrator. Doc. 142-8 at 4, § 11(a); *see Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) ("[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."). Nor does the court decide whether, as Instant Checkmate argues, Doc. 142 at 12, Adams's visits to its website in 2017 and 2019 establish her assent to the more recent versions of the Terms of Use. The resolution of that question could affect whether Adams's claim is subject to arbitration, as the more recent versions of the Terms narrow the class of disputes subject to arbitration.

**Conclusion**

Instant Checkmate's motion to compel arbitration is granted. If Adams wishes to pursue her claim against Instant Checkmate, she must do so in arbitration, where the arbitrator will determine whether her claim is arbitrable and, if so, will resolve it on the merits. This suit is stayed as to Adams's claim pending resolution of the arbitration. *See Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008) ("As this Court has noted on numerous occasions, the proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright.") (internal quotation marks omitted); *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 528 (7th Cir. 1996) ("In a suit 'upon any issue referable to arbitration under an agreement in writing for such arbitration,' the court, upon determining that the issue involved in the suit is indeed referable to arbitration, shall upon application of a party stay the judicial proceeding.") (quoting 9 U.S.C. § 3); *Kroll v. Doctor's Assocs., Inc.*, 3 F.3d 1167, 1171 (7th Cir. 1993) (holding that 9 U.S.C. § 3 "plainly requires that a

district court stay litigation where issues presented in the litigation are the subject of an arbitration agreement") (internal quotation marks and emphasis omitted).

July 19, 2021

United States District Judge