UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FISCHER, STEPHANIE LUKIS, and TIFFANY ADAMS, individually and behalf of all others similarly situated, | ) ) ) | 19 C 4892 |
| | ) | |
| Plaintiffs, | ) | Judge Gary Feinerman |
| | ) | |
| vs. | ) | |
| | ) | |
| INSTANT CHECKMATE LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>Memorandum Opinion and Order</u>

Robert Fischer, Stephanie Lukis, and Tiffany Adams bring this putative class action against Instant Checkmate LLC, alleging violations of the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 *et seq.* Thus far in the litigation, the court has denied Instant Checkmate's motion to dismiss, Docs. 35-36 (reported at 454 F. Supp. 3d 746 (N.D. Ill. 2020)), denied its motions for reconsideration, certification of an interlocutory appeal, and summary judgment, Docs. 88-89 (reported at 542 F. Supp. 3d 831 (N.D. Ill. 2020)), and granted its motion to compel arbitration of Adams's claim, Docs. 160-161 (reported at 2021 WL 3033586 (N.D. Ill. July 19, 2021)). Plaintiffs move under Civil Rule 23 for class certification. Doc. 151. The motion is denied as to Adams because her claims must be arbitrated, and is granted in part and denied in part as to Fischer and Lukis.

### Background

This court's prior opinions, familiarity with which is assumed, describe the factual backdrop of this case. Only the pertinent details are set forth here.

1

A.      **Instant Checkmate's Search Function and Search Engine Optimization Directory**

Instant Checkmate operates www.instantcheckmate.com, a website that allows users to access background reports about people.  Doc. 167-2 at ¶¶ 2, 4.  The website has a free search function through which a user can search for an individual.  *Id*. at ¶ 5.  To conduct a search, the user enters the individual's first and last name into the search bar.  *Id*. at ¶ 9.  After progressing through additional pages, the website presents the user with a search results page.  *Id*. at ¶ 22.  Each result is a profile with a first name (or initial) and a last name, and may include an age, location(s), and names of possible relatives.  *Id*. at ¶¶ 24, 40.

A search results page typically lists more than one result, and often there are multiple results with the same name.  Doc. 167-15 at ¶ 8.  The website instructs the user to "[f]ind a result that matches whom you're looking for the most."  Doc. 167-2 at ¶ 23.  The user may select a search result by clicking the "OPEN REPORT" button for that result.  *Id*. at ¶ 25; Doc. 167-16 at ¶ 5.  If the user selects "OPEN REPORT," the website takes her through a series of pages before reaching the "registration page."  Doc. 167-2 at ¶¶ 28, 35, 37.  The registration page presents the user with the option to purchase an Instant Checkmate membership.  *Id*. at ¶ 37.

When a user selects a search result, Instant Checkmate records a "record pointer," also called a "search person ID," in its "event services database."  Doc. 167-16 at ¶ 14.  A record pointer is a unique identifier corresponding to the background report for the search result selected by the user.  *Ibid*.  The record pointer does not contain any of the information displayed in the search result; Instant Checkmate does not store that information.  *Id*. at ¶¶ 7, 9, 15.  According to Instant Checkmate, there is no way to recreate the search results displayed to any user in the past because its "data provider's data are constantly changing or being updated."  *Id*. at ¶ 9.

Instant Checkmate also maintains a Search Engine Optimization ("SEO") Directory, which is designed to improve the site's rankings on Google and other search engines. Doc. 167-15 at ¶ 15. The SEO Directory has profiles of persons with each person's name and sometimes their age, location(s), and possible relatives. *Id*. at ¶ 18. The directory makes the underlying data available to search engines, though not in the form of discrete profiles. *Id*. at ¶ 19. The directory's data are generated through searches on both Instant Checkmate's website and partner sites. *Id*. at ¶¶ 20, 22. The data in the SEO Directory is not necessarily shown to any user of Instant Checkmate's website. *Id*. at ¶¶ 20-24. Instant Checkmate does not track, and in general cannot determine, whether any specific individual's SEO Directory profile was displayed to or selected by a user. *Id*. at ¶¶ 27-28.

**B.     Instant Checkmate's Terms of Use and Class Action Waivers**

Instant Checkmate asserts, and Plaintiffs do not dispute, that Fischer and Lukis agreed to its Terms of Use by accessing its website. Doc. 167 at 14-15; Doc. 177 at 5. The Terms of Use, which are governed by California law, Doc. 167-14 at 20, have two class action waivers, both under the heading "Arbitration and Class Action Waiver," *id*. at 17-19.

The first waiver appears as part of an arbitration agreement. The arbitration agreement states that "all claims, disputes or controversies between [users] and Instant Checkmate … including … claims based upon any federal, state or local statute … shall be resolved by the final and binding arbitration procedures set forth below." *Id*. at 18. The next sentence states that "any such claims shall be brought solely in the party's individual capacity, and not as a plaintiff or class member in any purported class, representative proceeding, or private attorney general capacity." *Ibid*. The following sentence prohibits the arbitrator from "consolidat[ing] more than one person's claims" or "otherwise presid[ing] over any form of a representative or class proceeding." *Ibid*.

3

The second class action waiver, which appears several paragraphs later, states that it is both "[s]eparate and apart from the agreement to arbitrate set forth above" and "material and essential to the arbitration of any disputes between the parties and … non-severable from the agreement to arbitrate claims." *Id*. at 19. The second waiver "independently waive[s] any right to bring or participate in any class action in any way related to, arising from, this agreement." *Ibid*.

In October 2020, Instant Checkmate moved to compel the arbitration of Lukis's and Fischer's claims. Doc. 90. Instant Checkmate then withdrew the motion, thereby waiving whatever arbitration rights it might have had against them. Doc. 110. In so doing, Instant Checkmate expressly reserved its right to enforce the class action waiver against them in the event they sought class certification. *Id*. at 1.

As of November 13, 2020, Instant Checkmate updated the Terms of Use to include a consent provision directed at users who search the website for themselves, or who authorize another person to do so. Doc. 167-2 at ¶ 50; Doc. 167-7 at 5-6. The provision purports to grant Instant Checkmate the self-searching user's consent "to the use and display of information about [the user] (including, without limitation, [the user's] name and other attributes of [the user's] identity) … for any and all commercial and non-commercial purposes." Doc. 167-7 at 5.

### C. Proposed Class Definitions

Plaintiffs propose three classes. The putative Injunctive Relief Class, which Plaintiffs seek to certify under Rule 23(b)(2), is defined as: "All Illinois residents for whom (i) Defendant can generate a name, age, and one or more location(s) and relative(s) (ii) in either the SEO Directory or the Search Results of the Website." Doc. 151 at 10.

The other two proposed classes, which Plaintiffs seek to certify pursuant to Rule 23(b)(3), seek only statutory damages for past IRPA violations and exclude anyone who has incurred actual damages. *Id*. at 10-11. The putative Search Results Class is defined as:

> All Illinois residents for whom (i) a Search Result was listed on the Website (ii) that included their name, age, location(s), and relative(s) and (iii) was actually selected by a user of the Website (iv) during a period beginning January 1, 2016 and continuing to the date of class certification.

*Ibid*. And the putative SEO Directory Class is defined as:

> All Illinois residents who were listed in the SEO Directory on or since the date of filing of the complaint and continuing to the date of class certification, where such listing included that person's name, age, location(s), and relative(s).

*Id*. at 11.

## Discussion

A court's analysis of class certification "is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure." *Chi. Teachers Union, Loc. No. 1. v. Bd. of Educ.*, 797 F.3d 426, 433 (7th Cir. 2015). To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or

5

(3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); *see also Bell*, 800 F.3d at 373 ("In addition to meeting [the Rule 23(a)] requirements, the class must satisfy one of the ... conditions in Rule 23(b)."). Finally, the class must be "identifiable as a class," meaning that the "class definitions must be definite enough that the class can be ascertained." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659-72 (7th Cir. 2015) (reviewing Rule 23's "ascertainability requirement").

Fischer and Lukis bear the burden of showing by a preponderance of the evidence that each requirement for class certification is satisfied. *See Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). "[A] district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889-90 & n.6 (7th Cir. 2011) (same). For the following reasons, Fischer and Lukis meet their burden as to the SEO Directory Class and Injunctive Relief Class, but not as to the Search Results Class.

## I. Rule 23(a)

Instant Checkmate concedes that Rule 23(a)(1) numerosity and Rule 23(a)(2) commonality are satisfied, and contests only Fischer's and Lukis's typicality and adequacy under Rules 23(a)(3) and (a)(4). Those criteria are satisfied as well. Plaintiffs' claims are typical because they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and [are] based on the same legal theory." *Lacy v. Cook Cnty.*, 897 F.3d 847, 866 (7th Cir. 2018). Specifically, Fischer and Lukis allege that Instant Checkmate

appropriated their and the putative class members' identities by including them in its search results and in the SEO Directory, in violation of the IRPA. Similarly, Fischer and Lukis are adequate because they are "member[s] of the putative class and have the same interest and injury as other members," *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018), and there are no apparent conflicts of interest within the classes that would require them "to choose between competing class members," *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012). Instant Checkmate presents several challenges to typicality and adequacy, but none has merit.

### A.    Class Action Waivers

Instant Checkmate argues that Fischer's and Lukis's assent to the Terms of Use, and thus to the two class action waivers therein, precludes them from representing the proposed classes. Doc. 167 at 16. Even assuming that a proposed class representative subject to a class waiver is necessarily inadequate or atypical, *see Korea Week, Inc. v. Got Cap., LLC*, 2016 WL 3049490, at *11 (E.D. Pa. May 27, 2016) (holding that named plaintiffs who had signed enforceable class action waivers were inadequate), Instant Checkmate's argument fails because the two waivers do not govern the IRPA claims Plaintiffs bring here.

As noted, the first class waiver appears as part of the Terms of Use's arbitration agreement. "[A]lthough class action waivers are often found in arbitration agreements … , the two contract terms are conceptually distinct." *Laver v. Credit Suisse Sec. (USA), LLC*, 976 F.3d 841, 846 (9th Cir. 2020) (internal quotation marks, alterations, and emphasis omitted) (noting that "[a] class action waiver is a promise to forgo a procedural right to pursue class claims," while "an agreement to arbitrate is a promise to have a dispute heard in some forum other than a court") (internal quotation marks and emphasis omitted). Thus, Instant Checkmate's waiver of its right to seek arbitration of Fischer's and Lukis's claims does not by itself make the first class

7

waiver unenforceable against them—especially because Instant Checkmate expressly preserved its right to enforce the class waivers. Doc. 110 at 1. Rather, the effect of the first class waiver depends on whether its language, considered in context, waives class arbitration, class action litigation, or both.

By its express terms, the first waiver applies only in arbitration. The waiver's text, emphasized below, appears amid, and is inextricably intertwined with, the Terms of Use's arbitration agreement:

> [Y]ou and Instant Checkmate understand and agree that all claims, disputes or controversies between you and Instant Checkmate … including … claims based upon any federal, state or local statute … shall be resolved by the final and binding arbitration procedures set forth below. *The parties acknowledge and agree that any such claims shall be brought solely in the party's individual capacity, and not as a plaintiff or class member in any purported class*, representative proceeding, or private attorney general capacity. The parties further agree that the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.

Doc. 167-14 at 18 (emphasis added).

Although the waiver, standing alone in the second sentence of this three-sentence passage, is not specific to arbitration or litigation, the sentences that precede and follow it provide "important context." *Meyer v. Kalanick*, 185 F. Supp. 3d 448, 453 (S.D.N.Y. 2016) (California law); *see* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, … each clause helping to interpret the other."). Specifically, "[t]he provisions directly before and after the [first class waiver] … concern arbitration": the first sentence defines the set of claims subject to arbitration, and the third "elaborates on certain features of the arbitration proceedings." *Meyer*, 185 F. Supp. 3d at 453. Thus, the phrase "any such claims" in the class waiver plainly refers to the claims that the preceding sentence requires be brought in arbitration. *See Littlefield v. Mashpee Wampanoag Indian Tribe*, 951 F.3d 30, 37 (1st Cir. 2020) ("Normal usage in the

English language would read the word 'such' as referring to the entire antecedent phrase."); *Such*, Black's Law Dictionary (11th ed. 2019) ("That or those; having just been mentioned."). "Given this context, the [first class waiver] is most plausibly read as an explanation of the rights that the parties are giving up in agreeing to arbitrate disputes, and *not* as an independently effective waiver of the right to pursue a class action outside the arbitration context." *Meyer*, 185 F. Supp. 3d at 453-54; *accord Vine v. PLS Fin. Servs., Inc.*, 807 F. App'x 320, 328 (5th Cir. 2020) (citing *Meyer* with approval in construing a similar provision).

Pressing the contrary result, Instant Checkmate cites *Horton v. Dow Jones & Co.*, 804 F. App'x 81 (2d Cir. 2020), and *Bock v. Salt Creek Midstream LLC*, 2020 WL 5640669 (D.N.M. Sept. 22, 2020). Doc. 167 at 15 n.6. Because the class waivers in those decisions materially differ from the first class waiver here, neither decision helps Instant Checkmate. In *Horton*, the Second Circuit sensibly held that a waiver prohibiting "*both* 'class arbitrations *and* class actions'" applied in both arbitration and litigation. 804 F. App'x at 84 (emphasis added). Instant Checkmate's first class waiver, however, does not specifically prohibit both "class actions" and "class arbitrations." In *Bock*, the district court held that, "[b]y its plain language, the class action waiver provision is not tied to the arbitration provisions at issue," in part because the class waiver and the arbitration provisions appeared in entirely different sections of the contract. 2020 WL 5640669, at *9. By contrast, Instant Checkmate's first class waiver is inexorably intertwined with its arbitration agreement and thus is best read as applying only in arbitration.

Instant Checkmate's invocation of its second class waiver—under which Fischer and Lukis "waive[d] any right to bring or participate in any class action in any way related to, or arising from," the Terms of Use, Doc. 167-14 at 19—fails as well. Plaintiffs' IRPA claims do not "relate[] to" or "aris[e] from" the Terms of Use because the Terms govern only *their* use of

the site, while their IRPA claims arise from *other* users' use of the site. *See Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 792 (N.D. Ill. 2021) (holding that the plaintiff's materially identical IRPA claims against Whitepages Inc. did not relate in any way to the plaintiff's use of Whitepages's services). Accordingly, the second class waiver does not preclude Plaintiffs from pursuing class litigation of their IRPA claims.

Because neither class action waiver, by its own terms, applies to Fischer's and Lukis's IRPA claims, there is no need to decide whether the waivers are unconscionable under California law. *See Discover Bank v. Superior Ct.*, 113 P.3d 1100, 1110 (Cal. 2005) (holding that some class action waivers are unconscionable), *abrogated in part by AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

### B.      Membership in the Putative Classes

Instant Checkmate next argues that Fischer and Lukis cannot be adequate or typical because they are not members of the putative classes. Doc. 167 at 23-24; *see Orr v. Shicker*, 953 F.3d 490, 499 (7th Cir. 2020) ("A class representative must be part of the class … ."). That argument fails to persuade.

As to the SEO Directory Class, Instant Checkmate argues that Plaintiffs "have failed to prove that their SEO Directory profiles were displayed to a third-party [Instant Checkmate] user." Doc. 167 at 23. Even if factually correct, that argument is immaterial to class membership, for the SEO Directory Class definition, by its terms, does not require that a class member's profile have been displayed to any third-party user. Doc. 151 at 11. Instant Checkmate also contends that Fischer "does not claim that his identity was 'listed in the SEO Directory.'" Doc. 167 at 23. That argument is unpersuasive, for by Instant Checkmate's own admission, it has "suppressed" Fischer's information, a term it defined as "block[ing] a person's … SEO Directory profile." Doc. 167-16 at ¶¶ 41-42.

Instant Checkmate next argues that the Search Results Class "must be limited (among other things) to Illinois residents whose search results were selected by a user *other than themselves*," and that Fischer's and Lukis's search results were not selected by anyone other than themselves. Doc. 167 at 24; Doc. 167-16 at ¶ 53. As with the SEO Directory Class, third-party display of a class member's search result is not part of the class definition. Doc. 151 at 10-11.

As for the Injunctive Relief Class, Instant Checkmate argues that Fischer's and Lukis's claims are moot because it has "suppressed" their information such that "it will not be displayed in a search result or SEO Directory profile." Doc. 167 at 24 (citing *Montoya v. Jeffreys*, 2020 WL 6581648, at *7, *15 (N.D. Ill. Nov. 10, 2020)); Doc. 167-16 at ¶¶ 41-43; *see Montoya*, 2020 WL 6581648, at *15 (holding that a named plaintiff was an inadequate class representative because her claim might be partially moot). "Voluntary cessation of challenged conduct moots a case, however, only if it is *absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal quotation marks omitted). Instant Checkmate makes no effort to meet its "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and alteration omitted). Thus, Fischer's and Lukis's claims for injunctive relief are not moot, and they retain a sufficient interest in the controversy to seek injunctive relief for the putative class members.

### C. Unique Defenses

Instant Checkmate next contends that Fischer and Lukis are subject to unique defenses. Doc. 167 at 24-25. "The presence of even an arguable defense peculiar to the named plaintiff … may destroy the required typicality of the class as well as bring into question the adequacy of the

named plaintiff's representation." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011). But neither defense asserted by Instant Checkmate defeats adequacy.

As to Fischer, Instant Checkmate contends that "because he is at least a limited purpose public figure," he "cannot maintain an IRPA claim." Doc. 167 at 24-25. Even if Fischer were a limited purpose public figure, *but see* 542 F. Supp. 3d at 841 ("Plaintiffs are not public figures … ."), that argument fails. At common law, a public figure's right of publicity claim turned on how the defendant used the public figure's identity. *See Jackson v. MPI Home Video*, 694 F. Supp. 483, 492 (N.D. Ill. 1988) (explaining that "[p]ublic figures possess this right with respect to commercial use of their names and likeness," but not "against the use of name and likeness in the news media"); *see also McFarland v. Miller*, 14 F.3d 912, 918 (3d Cir. 1994) ("The right of publicity signifies the right of an individual, *especially a public figure* or a celebrity, to control the commercial value and exploitation of his name and picture or likeness … .") (emphasis added) (internal quotations marks and alteration omitted). Reflecting that understanding, the IRPA does not carve out a *per se* exception to liability for the use of a public figure's identity; rather, it exempts only the "use of an individual's identity for non-commercial purposes," without differentiating between public and non-public figures. 765 ILCS 1075/35(b)(2); *see Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 805 (N.D. Ill. 2021) (noting "the continuity between the common law and the IRPA"). Accordingly, Fischer's purported status as a public figure does not bar Instant Checkmate's liability. Rather, liability will turn on how Instant Checkmate's used Fischer's (and Lukis's and the other putative class members') identities and whether that use falls within any statutory exemption.

As to Lukis, Instant Checkmate contends that she may be subject to a statute of limitations defense because she waited nearly five years after searching for herself (thereby

triggering her inclusion in the SEO Directory) to bring her claim. Doc. 167 at 25. Whether the IRPA statute of limitations is one year or five years is an open question, but "[t]he weight of authority from this District supports the application of a one-year statute of limitations." *Lopez v. Admiral Theatre, Inc.*, 2019 WL 4735438, at *2 (N.D. Ill. Sept. 26, 2019); *see Tims v. Black Horse Carriers, Inc.*, __ N.E.3d __, 2021 IL App (1st) 200563, at ¶ 21 (Ill. App. Sept. 17, 2021) (observing that a one-year limitations period "applies to … [claims alleging] the appropriation of the name or likeness of another"), *appeal allowed*, 2022 WL 808656 (Ill. Jan. 26, 2022). Because Instant Checkmate's limitations defense is at least arguable as to Lukis—and potentially relevant to many putative class members' claims—the court, as Plaintiffs propose, Doc. 177 at 28, will certify two subclasses, one for class members satisfying a one-year statute of limitations, and the other for those satisfying only a five-year statute of limitations. *See* Fed. R. Civ. P. 23(c)(5); *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1081 (7th Cir. 2013) (endorsing the use of subclasses to solve typicality or adequacy problems arising from potential statute of limitations issues); *Boyd v. Meriter Health Servs. Emp. Ret. Plan*, 2012 WL 12995302, at *11 (W.D. Wis. Feb. 17, 2012) ("[T]he use of subclasses is well-established to address a statute of limitations defense … ."), *aff'd*, 702 F.3d 364 (7th Cir. 2012). Fischer may serve as the class representative for the one-year subclass—as Instant Checkmate does not suggest that his claim is time barred, even if the one-year statute of limitations applies—and Lukis can serve as the representative of the five-year subclass.

### D. Idiosyncratic Grievances

Instant Checkmate next asserts that Fischer and Lukis have idiosyncratic motivations for prosecuting this suit. Doc. 167 at 25-26. That assertion, even if correct, is immaterial to typicality and adequacy. "As a general matter, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members

and his or her claims are based on the same legal theory." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021) (internal quotation marks and alteration omitted). Put another way, "typicality under Rule 23(a)(3) should be determined with reference to the company's actions." *CE Design*, 637 F.3d at 725; *see Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("[W]e look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)."). The putative class members' claims arise from the very course of conduct alleged to have injured Fischer and Lukis, and the legal theories underlying all class members' claims are identical. Plaintiffs' purportedly idiosyncratic motivations therefore have no bearing on typicality, and there is no basis to hold any differently as to adequacy. *See CE Design*, 637 F.3d at 724 ("In many cases, … the requirement of typicality merges with the further requirement that the class representative 'will fairly and adequately protect the interests of the class.'") (quoting Fed. R. Civ. P. 23(a)(4)).

### E. Lukis's Credibility

Finally, Instant Checkmate argues that Lukis has "serious credibility problems" that undermine her adequacy as a class representative. Doc. 167 at 26. Although Lukis may face substantial challenges to her credibility at trial, "any weaknesses in [her] integrity [do] not relate to a central element of the litigation." *Lacy*, 897 F.3d at 867. The jury's assessment of whether Instant Checkmate appropriated Lukis's identity, without her consent, for its commercial benefit is highly unlikely to turn on the credibility of her testimony. Accordingly, Instant Checkmate has failed to present "compelling evidence that [Lukis's] credibility would detract from the adjudication of the class-wide claims," which means that her alleged credibility problems do not defeat her adequacy as a class representative. *Ibid*.

## II.    Rule 23(b)

Next, the parties contest whether the proposed classes satisfy Rules 23(b)(2) (as to the Injunctive Relief Class) and (b)(3) (as to the Search Results and SEO Directory Classes). Rule 23(b)(2) requires that the class be cohesive and that an injunction be "appropriate respecting the class as a whole," while Rule 23(b)(3) requires finding that common questions "predominate" over individual questions and that a class action is "superior" to other forms of adjudication.  Fed. R. Civ. P. 23(b)(2), (3); *see Howard*, 989 F.3d at 597 ("Where, as here, plaintiffs seek certification under Rule 23(b)(3), a court must find that common questions of law or fact 'predominate' over individual ones and that a class action is 'superior' to other methods of adjudicating the case."); *Kartman*, 634 F.3d at 893 n.8 ("Where a class is not cohesive such that a uniform remedy will not redress the injuries of *all* plaintiffs, class certification [under Rule 23(b)(2)] is typically not appropriate.").  Because the parties treat Rule 23(b)(2) cohesion and Rule 23(b)(3) predominance interchangeably, Doc. 167 at 16; Doc. 177 at 9, the court will do so as well.

"The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton*, 907 F.3d at 1029.  That analysis "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  The "substantive elements of an IRPA claim" are "(1) the appropriation of one's identity, (2) without one's consent, (3) for another's commercial benefit." *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1008 (7th Cir. 2019).  At least the first and third elements present common questions.  Whether Instant Checkmate's use and display of putative class members' attributes appropriates their identities for its own commercial benefit turns on how the company uses and displays its search results and SEO Directory, not any circumstances particular to a class member.  Resolution of those elements will turn on

15

common proof regarding Instant Checkmate's website and business practices.  *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) ("[A] common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.") (internal quotation marks and alteration omitted).  And contrary to Instant Checkmate's arguments, which are addressed below, those common questions predominate over any remaining individual questions.

### A.    Common Proof for the Identity Element

Instant Checkmate argues that *Dancel* categorically forecloses class certification in IRPA cases.  Doc. 167 at 17-19.  In *Dancel*, the Seventh Circuit affirmed the district court's denial of class certification in a suit alleging that the defendant's commercial use of the plaintiff's Instagram username violated the IRPA, reasoning that the question whether a particular username identified a particular person, and thus whether a username is part of "an individual's identity" for IRPA purposes, 765 ILCS 1075/30(a), could not be established with common proof on a classwide basis.  *Dancel*, 949 F.3d at 1009.  As the Seventh Circuit explained, because "Instagram usernames identify only Instagram accounts," whether a username identifies (or, conversely, obscures) the identity of a particular *user* can be answered only on an individual basis based on the username's content.  *Id*. at 1008-09.  Thus, common proof that usernames are unique would not show that each username identifies the user to whom the username belonged— so, for example, whether the username "meowchristine" identified a particular person might yield an answer different from whether the usernames "isa.tdg," "artistbarbie," or "loparse" did so.  *Id*. at 1010.  That made the IRPA's identity element an individual question rather than a common question—let alone a predominating common question—thereby defeating class certification under Rule 23(b)(3).  *Ibid*.; *see Tyson Foods*, 577 U.S. at 453 ("An individual

question is one where members of a proposed class will need to present evidence that varies from member to member … .").

*Dancel* is inapposite here because the array of personal attributes used on Instant Checkmate's website—name, age, location(s), and possible relative(s)—is easily distinguishable from Instagram usernames. The *Dancel* plaintiff's proposed common proof, "that usernames are unique," failed to answer "[w]hether the appropriated attribute serves to identify a particular person"—that is, whether a username constitutes an individual's "identity" for IRPA purposes. *Id*. at 1009. Here, although a user's search for a name and location on Instant Checkmate's website will sometimes produce multiple resulting entries with similar names, the search results page directs the user to "[f]ind a result that matches whom you're looking for the most" based on the displayed attributes. Doc. 167-2 at ¶¶ 22-23. Thus, Instant Checkmate displays name, age, location(s), and relative(s) on the search results page precisely *because* those attributes allow a user to identify the *particular* person for whom the user is searching. So, a reasonable jury could find, as a categorical matter, that a search result displaying a name, age, location(s), and relative(s) "serves to identify that individual to an ordinary, reasonable viewer" for IRPA purposes. 765 ILCS 1075/5; *see* 454 F. Supp. 3d at 761 (explaining that Instant Checkmate's combination of these attributes makes unique identification plausible). Similarly, a jury could find that Instant Checkmate includes those attributes in the SEO Directory to allow unique identification in search engine results, thereby driving traffic to Instant Checkmate's website.

### B. Possible Individual Questions

Instant Checkmate next contends that an array of individual questions pertaining to each putative class member's claim undermine predominance. "Neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). Rather, "[t]he predominance inquiry asks

17

whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (internal quotation marks omitted).

### 1.    Consent to Instant Checkmate's Use of Identity

Instant Checkmate first contends that individual questions about putative class members' consent to its use of their identities are likely to predominate.  Doc. 167 at 19-21.  Instant Checkmate submits that putative class members could have consented either (1) under the Terms of Use by conducting a self-search after November 13, 2020, or (2) by consenting to data sharing by unidentified non-parties.  *Ibid*.  Those questions are unlikely to distract from the central focus of the litigation and thus do not defeat predominance (or cohesion).

As to putative class members who conducted a self-search after November 13, 2020, questions about the validity or effect of the Terms of Use's new consent provision can be resolved in a single stroke.  *See Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 587 (N.D. Ill. 2018) ("[I]f the defendant obtained the class members' consent for calls in a uniform manner, consent can be resolved on a class-wide basis.").  If it becomes necessary to do so, the court could create a subclass to specifically address the validity of the consent provision for those putative class members.  *See* Fed. R. Civ. P. 23(c)(1)(C), (c)(5).  If the consent provision is found valid, individual questions will remain about which putative class members conducted a self-search after November 13, 2020, but that straightforward question would not predominate over the more important, common questions at stake.  *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("Predominance … is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.").  Rather, that question could be easily and mechanically resolved during claims

administration by consulting Instant Checkmate's records. *See Messner*, 669 F.3d at 819 (holding that the availability of "common evidence and common methodology to prove a class's claims is sufficient to support a finding of predominance"); *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 966 (9th Cir. 2013) (affirming a finding of predominance because liability and damages "would not be difficult to determine" from the defendant's records).

As for consenting to data sharing by non-parties, Instant Checkmate admits in an interrogatory response that its Terms of Use is the sole method by which it received consent from Illinois residents to advertise the availability of their background reports on its website. Doc. 151-2 at p. 2, ¶ 6 ("Apart from the Terms of Use … , do you [Instant Checkmate] maintain that you received consent from any Illinois resident to advertise the availability for their background report on your website? … No."). Accordingly, whatever consent a putative class member gave to a non-party to use or share her identity has no bearing on whether that putative class member consented to Instant Checkmate's use of her identity.

### 2.     Public Figures

Next, Instant Checkmate contends that determining whether each putative class member is a public figure will pose a fact-intensive inquiry predominating over common questions. Doc. 167 at 21-22. As shown above, IRPA liability does not turn on whether a plaintiff or putative class member is a public figure. It follows that individual questions concerning whether a putative class member qualifies a public figure are not even pertinent, let alone predominant.

### 3.     Agreement to Arbitrate

Finally, Instant Checkmate contends that the need to identify putative class members subject to binding arbitration will predominate over common questions. Doc. 167 at 22-23. That argument is unpersuasive for three reasons. First, Instant Checkmate "did not provide sufficient

particularized evidence regarding potential class members who may be subject to arbitration." *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 107 n.7 (N.D. Ill. 2013); *see Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016) (noting that a "smattering of individual contract defenses," including "mandatory arbitration … clauses," "does not undermine the superiority of the (b)(3) class action"). Second, if there are absent class members who agreed to arbitrate their disputes with Instant Checkmate pursuant to the Terms of Use, Instant Checkmate could, if it wishes, move to compel arbitration as to those individuals after class certification without fear that its litigation conduct will have waived its rights those arbitration agreements. *See Garcia v. JCPenney Corp., Inc.*, 2016 WL 878203, at *7 & n.4 (N.D. Ill. 2016) ("[T]he sensible course in this case is to decide whether to certify the class without considering the possibility of arbitration and then allow JCPenney, if it so chooses, to file its motion to compel arbitration."). Third, like the question of consent, any question about which class members agreed to arbitration could be mechanically resolved by consulting Instant Checkmate's records.

### C.     Definitional Overbreadth

Next, Instant Checkmate contends that the damages classes "'are defined too broadly to permit certification' because they include 'a great many persons' who 'could not bring a valid [IRPA] claim.'" Doc. 167 at 26 (alteration in original) (quoting *Messner*, 669 F.3d at 824-25). Class certification does not depend on how many class members have meritorious IRPA claims. *See Messner*, 669 F.3d at 823 ("[T]hat some class members' claims will fail on the merits if and when damages are decided … [is] a fact generally irrelevant to the district court's decision on class certification."); *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("Rule 23 allows certification of classes that are fated to lose as well as classes that are sure to win."). That said, the inclusion in a class of too many members who "*could not* have been injured" is pertinent to

definitional overbreadth. *Suchanek*, 764 F.3d at 758. Instant Checkmate's arguments on this issue do not withstand scrutiny.

### 1. Display to Others

First, Instant Checkmate argues that the damages class definitions sweep in individuals "whose identity was not displayed to a third party." Doc. 167 at 28. According to Instant Checkmate, this is a problem because "each putative class member's search result or SEO Directory profile must have been displayed to someone other than themselves for to show a *prima facie* IRPA claim." *Ibid*. Under this reading of the IRPA, some putative class members could not have been injured because they cannot prove third-party display.

Instant Checkmate's reading of the IRPA is wrong. As noted, the IRPA prohibits "us[ing] an individual's identity for commercial purposes … without having obtained previous written consent." 765 ILCS 1075/30(a). "Commercial purpose" is defined as *either* "the public use *or* holding out" of an individual's identity. 765 ILCS 1075/5 (emphasis added).

The term "public use" in the IRPA means that some substantial number of people saw or were exposed to a person's identity. Illustrating the point, *Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923 (Ill. App. 2013), held that a photograph of the plaintiff seen by at most 31 persons or entities in a county of some 300,000 people was not "disseminated to the public," and therefore did not qualify as "public use." *Id*. at 929; *see also MetLife Invs. USA Ins. Co. v. Zeidman*, 734 F. Supp. 2d 304, 311-12 (E.D.N.Y. 2010) (in finding no "public use," reasoning that the plaintiff's identity "was [n]ever allegedly published or otherwise made accessible to the public"), *aff'd sub nom. MetLife Invs. USA Ins. Co. v. Pratt*, 442 F. App'x 589 (2d Cir. 2011). At the same time, *Trannel* made clear that because "'[h]olding out' … must mean something other than 'public use,'" the term "holding out" does *not* require that the individual's identity

21

was seen by others.  987 N.E.2d at 930.  Rather, *Trannel* explained, "holding out … mean[s] the representation … of an individual's identity on or in conjunction with certain activities," and thus turns on the defendant's conduct, not on what the public perceived.  *Ibid*.  *Trannel* therefore concluded that an advertiser held out the plaintiff's identity by "deliberately placing" her photograph on a commercial product.  *Ibid*.

Accordingly, how many (if any) Instant Checkmate users saw a putative class member's search result or SEO Directory profile is immaterial to whether Instant Checkmate violated the IRPA by holding out that person's identity in connection with the offering for sale of its services. It follows that the putative classes could not be overbroad for including persons whose search results or SEO Directory profiles were never viewed by somebody else.

### 2. Extraterritorial Application

Second, Instant Checkmate contends that the damages class definitions "are overinclusive" because "they fail to limit membership to identities displayed in Illinois." Doc. 167 at 29.  As the parties appear to agree, the IRPA does not extend extraterritorially.  *Id*. at 28; Doc. 177 at 17-20.  That poses no problem, however, because the proposed classes do not require extraterritorial application of the IRPA.

The Supreme Court of Illinois has declined to adopt any "single formula or bright-line test" for determining whether a statutory violation occurs in Illinois.  *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005).  Instead, a court must analyze whether the circumstances relating to the legal dispute "occur primarily and substantially" within Illinois.  *Id*. at 853.  Circumstances will vary, but *Avery* directs courts to consider: the plaintiff's residence; the location of harm; communications between parties (where sent and where received); and where the defendant's policy is carried out.  *See id*. at 854.

Here, the bulk of those circumstances relate to Illinois. The putative classes, by definition, are limited to Illinois residents. Doc. 151 at 10-11. If Instant Checkmate appropriated a putative class member's identity, then that person lost control over the commercial exploitation of her identity in Illinois. If Instant Checkmate received consent from a putative class member, that consent presumably was sent from Illinois. Instant Checkmate's policy of displaying profiles was carried out on its website, and thereby occurred nationally and thus necessarily in Illinois. *Cf. Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) ("The alleged infringement took place on the Internet and was international in scope, presumably occurring in Illinois."). Accordingly, under the totality of the circumstances, adjudicating putative class members' claims would not involve extraterritorial application of the IRPA. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 & n.7 (9th Cir. 2019) (explaining that a statute's "application to individuals who are located in Illinois, even if some relevant activities occur outside the state," is not extraterritorial).

Pressing the contrary result, Instant Checkmate focuses on where its users viewed the putative class members' profiles. Doc. 167 at 29. True enough, "[web]site access … might be part of the *Avery* calculus." *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1101 (N.D. Ill. 2017). Given the countervailing factors referenced above, however, "focusing solely" on that one factor would "create questionable results," *Avery*, 835 N.E.2d at 853, particularly because, as shown above, third-party viewing is not an element of an IRPA claim.

In sum, the putative classes are defined in a way that requires the IRPA to be applied only in Illinois. "And of course, if future decisions or circumstances lead to the conclusion that extraterritoriality must be evaluated on an individual basis, the … court can decertify the class." *Patel*, 932 F.3d at 1276.

### 3. Commercial Purpose

Third, Instant Checkmate contends that the class definitions are overbroad because "a potential class member could not have a viable IRPA claim unless the [Instant Checkmate] user searching for that member viewed the website's registration page."  Doc. 167 at 30.  This is so, according to Instant Checkmate, because only the registration page offers to sell a membership. *Ibid*.  That argument fails.

Suppose a company used an individual's identity in a print advertisement, without that individual's consent, directing viewers to the company's website or store.  That use would have a "commercial purpose," regardless of how many people ultimately entered the store or interacted with the website, because the company "held out" that individual's identity.  *See Trannel*, 987 N.E.2d at 930 (holding that the IRPA prohibits the "representation" of a person's identity in connection with "an offering for the sale of a product, merchandise, goods, or services").  So, too, here.  As shown above, how many viewers proceeded to the registration page after seeing a putative class member's profile is immaterial under the IRPA because the statute does not impose a viewership requirement.  Rather, the pertinent liability issues are whether Instant Checkmate held out a putative class member's identity to sell subscriptions, and whether such use served a commercial purpose.  It follows that a putative class member may recover regardless of whether any user ultimately viewed the website's registration page after searching for that putative class member.

### D. Superiority and Manageability

Instant Checkmate argues that the two proposed damages classes do not satisfy the superiority and manageability requirements of Rule 23(b)(3).  Doc. 167 at 31; *see Mullins*, 795 F.3d at 663 (noting that superiority encompasses "the likely difficulties in managing a class

action'") (quoting Fed. R. Civ. P. 23(b)(3)(D)).  Instant Checkmate is correct as to the Search

Results Class, but not the SEO Directory Class.

### 1. Search Results Class

As noted, the proposed Search Results Class is defined in relevant part as Illinois

residents for whom "a Search Result was listed on the Website … that included their name, age,

location(s), and relative(s)" and that "was actually selected by a user of the Website."  Doc. 151

at 10.  Instant Checkmate contends that because it cannot be determined from its records which

persons' search results were "actually selected by a user of the Website," it is impossible to

discern who is in the Search Results Class.  Doc. 167 at 34-35.  As Instant Checkmate shows, it

"does not store the information that was displayed in the selected search result" and "cannot

recreate the information that was displayed in a specific selected search result."  Doc. 167-16 at

¶ 7.  According to Instant Checkmate, the unique identifier, or record pointer, that it stores for

each search selection "does not contain any of the information that was displayed in the search

result to the [Instant Checkmate] user."  *Id*. at ¶¶ 14-15.

Plaintiffs do not dispute those points, and therefore must provide a workable solution.

*See Mullins*, 795 F.3d at 664 ("If faced with what appear to be unusually difficult manageability

problems at the certification stage, district courts have discretion to insist on details of the

plaintiff's plan for … managing the action.").  To overcome the lack of records showing which

persons' search results were selected by an Instant Checkmate user, Plaintiffs propose working

backwards from the record pointers stored by Instant Checkmate.  Doc. 174 at 23.  Specifically,

Plaintiffs submit that, for each record pointer, Instant Checkmate can query its data provider for

the background report on the associated person.  *Ibid*.  Then, using those background reports,

putative class members' names and other identifying information can be reconstructed.  *Ibid*.

Plaintiffs' proposal is not workable. Instant Checkmate's background reports are not static, as "the data provider's data are constantly changing or being updated." Doc. 167-16 at ¶ 9. As a result, the current version of a background report may list attributes for the selected individual different from those displayed when that individual's search result was viewed in the past. Thus, a background report generated today for Jane Doe might display certain name(s), age(s), location(s), or relative(s) that were not displayed when her profile previously was viewed by an Instant Checkmate user. The proposed class definition, however, requires that the class member's search result listing had all of those attributes *when it was selected by a user*. Doc. 151 at 10 (defining the proposed class as encompassing individuals whose selected search result "included" their name, age, location(s), and possible relative(s)). As a result, there is a mismatch between Plaintiffs' methodology—which can demonstrate only that a putative class member's search result has an associated name, age, location(s), and relative(s) *today*—and the class definition—which requires those attributes to have been used *in the past*. Plaintiffs therefore fail to show that the Search Results Class meets the superiority requirement of Rule 23(b)(3).

### 2. SEO Directory Class

As noted, the putative SEO Directory Class is defined in relevant part as: "Illinois residents who were listed in the SEO Directory on or since the date of filing of the complaint and continuing to the date of class certification, where such listing included that person's name, age, location(s), and relative(s)." Doc. 151 at 11. Because the SEO Directory does not indicate where a person currently lives, Instant Checkmate contends that the putative class is unmanageable given the difficulties of determining whether any particular putative class member resides in Illinois. Doc. 167 at 32. That objection fails, as affidavits may be used to establish

residency during the claims administration process if the class prevails at trial. *See Dancel*, 949 F.3d at 1009-10 ("We have permitted district courts, in their discretion, to use individual affidavits to identify class members after liability is established class-wide, or to resolve individual merits questions after resolution of class issues.") (citations omitted).

Instant Checkmate next contends that, in general, it cannot "determine whether a specific individual's profile was actually displayed to any user," let alone to a user in Illinois. Doc. 167 at 32 (emphasis deleted). That objection fails as well because, as shown above, Plaintiffs' claims do not require any third-party display, much less third-party display in Illinois. The same rationale defeats Instant Checkmate's argument that there is no way to determine whether a putative class member's information was displayed to a user who eventually reached the registration page. *Id*. at 34.

### 3. Statutory Damages and Attorney Fees

Instant Checkmate next contends that the ability of prevailing IRPA plaintiffs to recover statutory damages and attorney fees undermines superiority. *Id*. at 36. That argument fails, as statutory damages under the IRPA are only $1,000, *see* 765 ILCS 1075/40(a)(2); *Trannel*, 987 N.E.2d at 933, and recovering "up to $1,000 in statutory damages … is unlikely to provide sufficient incentive for individual members to bring their own claims." *Pawelczak v. Fin. Recovery Servs., Inc.*, 286 F.R.D. 381, 387 (N.D. Ill. 2012); *accord Redmon v. Uncle Julio's of Ill., Inc.*, 249 F.R.D. 290, 296 (N.D. Ill. 2008) ("With statutory damages maxing out at $1,000, … individual plaintiffs do not have sufficient incentives to litigate independently. This is precisely the situation Rule 23(b)(3) was designed to overcome.") (citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)); *cf. Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (holding that a class action was not superior when a typical prevailing

plaintiff "can expect to receive over $50,000, plus attorney's fees and costs"). The availability of attorney fees for prevailing plaintiffs, *see* 765 ILCS 1075/55, does not undermine this conclusion. *See In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 409 (3d Cir. 2015) (rejecting the argument that superiority was not satisfied "because [the putative class members] are pursuing statutory claims that permit recovery of their attorneys' fees"); *Herket v. MRC Receivables Corp.*, 254 F.R.D. 344, 353 (N.D. Ill. 2008) (finding a class action superior even though "actual damages, statutory damages and attorneys' fees are awarded to successful [Fair Debt Collection Practices Act] litigants"); *Thomas v. Cap. One Auto Fin., Inc.*, 2006 WL 3065498, at *5 (N.D. Ill. 2006) (same, in a Fair Credit Reporting Act suit).

In sum, a class action is the superior method of adjudication for the SEO Directory Class.

### E. Appropriateness of Equitable Relief

As noted, the putative Injunctive Relief Class is defined as: Illinois residents for whom Instant Checkmate "can generate a name, age, and one or more location(s) and relative(s)" in "either the SEO Directory or the Search Results of the Website." Doc. 151 at 10. Plaintiffs seek an injunction forbidding Instant Checkmate from using class members' names and attributes to advertise its products and services. Doc. 109 at ¶¶ 58, 61; *see* 765 ILCS 1075/50 (authorizing "permanent injunctions as may be appropriate" to cure IRPA violations).

In opposing certification of the Injunctive Relief Class, Instant Checkmate contends that "Plaintiffs 'cannot satisfy the test for a remedy in equity.'" Doc. 167 at 36 (quoting *Kartman*, 634 F.3d at 892). To obtain an injunction, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay v. MercExchange, L.L.C.*, 547 U.S.

28

388, 391 (2006). And for a Rule 23(b)(2) class to be certified, "[t]he contemplated equitable

relief must be (1) appropriate respecting the class as a whole and (2) final." *Kartman*, 634 F.3d

at 892 (internal quotation marks omitted).

Noting that it allows persons to opt out of the SEO Directory, Instant Checkmate argues

that injunctive relief is not appropriate for the Injunctive Relief Class as a whole because a

putative class member's failure to opt out means that they are suffering a self-inflicted injury,

thereby precluding them from obtaining injunctive relief. Doc. 167 at 36-37. "Only the injury

inflicted by one's adversary counts" as irreparable harm for purposes of obtaining injunctive

relief. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003). Although

a "readily avoidable" harm may in some circumstances be self-inflicted, the pertinent inquiry

"depends on the particular circumstances of the case," and a plaintiff must have a "true choice"

for a readily avoidable harm to qualify as a self-inflicted harm. *Stuller, Inc. v. Steak N Shake*

*Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012). Here, there is no indication that a significant

number of class members know about the opt-out function, and even if they did, it is not clear

that opting out is an appropriate substitute for an injunction because Instant Checkmate cannot

rule out the possibility that a new record could be generated after a class member opts out of the

SEO directory. Doc. 148-6 at 6 (20:15-20:24) (Instant Checkmate's Rule 30(b)(6) deponent did

not know whether a new record could be created for individuals who previously opted out); *see*

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034

(7th Cir. 2017) (explaining that irreparable harm is not "self-inflicted" when available alternative

choices fail to mitigate the claimed harm), *abrogation on other grounds recognized in Ill. Repub.*

*Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). At this stage, then, the opt-out option does

not defeat certification of a Rule 23(b)(2) class, though Instant Checkmate may reprise this argument in opposing injunctive relief on the merits at trial.

Instant Checkmate next argues that Plaintiffs have failed to show that money damages are inadequate to compensate for any injuries that they and the putative class have suffered. Doc. 167 at 37. This argument conflates "two distinct injuries: past and future" appropriation of the putative class members' identities. *Kartman*, 634 F.3d at 894 (citing *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004)). The members of the SEO Directory Class have allegedly "already suffered" misappropriation of their identities, and "damages would provide a final retrospective remedy for *that* injury." *Ibid*. By contrast, an injunction would "provid[e] a final prospective remedy for ongoing and future" IRPA violations. *Ibid*. The availability of monetary damages for the SEO Directory Class therefore does not preclude injunctive relief.

As to the balance of hardships, Instant Checkmate asserts, without any evidence, that it "would be unable to implement Plaintiffs' requested class injunctive relief without being forced to shut down its entire website in states in which there is no reason to do so because it is not possible for [Instant Checkmate] to determine the residency of any individual" listed on its site. Doc. 167 at 37. But even if Instant Checkmate's current records do not allow it to determine which persons are Illinois residents, it may be able to access and cross-reference other records to determine residency. Failing that, Instant Checkmate could choose to comply with an injunction by suppressing the records of any individual associated with an Illinois address regardless of the person's current residency. At this stage, the court cannot say that this burden on Instant Checkmate would outweigh by the irreparable harm to the class caused by misappropriation of the putative class members' identities. Again, Instant Checkmate may reprise this argument in opposing injunctive relief on the merits at trial.

Finally, Instant Checkmate contends that the public interest would be disserved by an injunction because "online marketplaces that many people rely on … display the same type of search results that Plaintiffs have identified as 'advertisements' under IRPA." Doc. 167 at 37. That conclusory assertion—unsupported by any record citation—does not persuade. An injunction would bind only Instant Checkmate, its "officers, agents, servants, employees, and attorneys," and "persons who are in active concert or participation" with any of those persons. Fed. R. Civ. P. 65(d)(2). In any event, "[n]o social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576 (1977) (citation omitted).

Accordingly, at least on the present record, the injunction sought by Plaintiffs is appropriate as to the Injunctive Relief Class as a whole, and that class may be certified under Rule 23(b)(2).

## Conclusion

Plaintiffs' class certification motion is granted in part (as to the SEO Directory and Injunctive Relief Classes) and denied in part (as to the Search Results Class). "An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Fed. R. Civ. P. 23(c)(1)(B); *see Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) ("[T]he obligation to define the class falls on the [district] judge's shoulders under [Rule 23(c)(1)(B)].").

The SEO Directory Class is defined as "All Illinois residents who were listed in Instant Checkmate's SEO Directory on or since June 21, 2019 (the date this suit was filed) and continuing to March 31, 2022 (the date of class certification), where such listing included that person's name, age, location(s), and relative(s), excluding anyone who has incurred actual

damages as defined in IRPA." The Injunctive Relief Class is defined as "All Illinois residents for whom Instant Checkmate can generate a name, age, and one or more location(s) and relative(s) in either the SEO Directory or the Search Results of www.instantcheckmate.com."

The SEO Directory Class has two subclasses. The one-year statute of limitations subclass comprises members of the SEO Directory Class who were first listed in the SEO Directory between June 21, 2018 (one year before the filing of this suit) and March 31, 2022 (the date of class certification). The five-year statute of limitations subclass comprises members of the SEO Directory Class who were first listed in the SEO Directory between June 21, 2014 (five years before the filing of this suit) and June 20, 2018. Because the Injunctive Relief Class appears to allege ongoing or continuing IRPA violations, the court need not subdivide that class to address any statute of limitations defense. *See Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1076 (7th Cir. 2013) (holding that a claim for injunctive relief against "ongoing" or "continuing" violations is not barred by the statute of limitations). If further developments require subdividing the Injunctive Relief Class as well, the court will amend this certification order. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

The claims, issues, and defenses to be tried are: (1) whether SEO Directory Class members' listings in the SEO Directory violates the IRPA; (2) whether Instant Checkmate has a valid affirmative defense to any alleged IRPA violation; and (3) whether Injunctive Relief Class members are entitled to an injunction forbidding Instant Checkmate from using class members' names and attributes to advertise its products and services.

Fischer and Lukis are the class representatives. For the SEO Directory Class, Fischer represents the one-year statute of limitations subclass, and Lukis the five-year subclass. Pursuant

to Rule 23(g), the following class counsel are appointed: Roberto Luis Costales and William Henry Beaumont of Beaumont Costales; Ari Jonathan Scharg, Benjamin Harris Richman, Benjamin Scott Thomassen, Michael W. Ovca, and Schuyler Ufkes of Edelson PC; and Philip Fraietta of Bursor & Fisher, P.A.

The parties shall confer regarding class notice and shall file a status report with their joint proposal or competing proposals by April 21, 2022.

March 31, 2022

_____
United States District Judge