# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ROBERT FISCHER and STEPHANIE
LUKIS, individually and on behalf of all
others similarly situated,

                Plaintiffs,

      v.

INSTANT CHECKMATE LLC,

                Defendant.

)
)
)
)
)
)
)
)
)
)
)

Case No. 1:19-cv-04892

Hon. Judge Manish S. Shah

## INSTANT CHECKMATE LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR DECERTIFICATION OF THE SEO DIRECTORY CLASS

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................2

A.     ICM's Services.................................................................................................2

B.     Proceedings Regarding the Complaint..............................................................5

C.     Class Certification............................................................................................5

D.     Developments After Class Certification ..........................................................7

ARGUMENT ...............................................................................................................9

I.     The Court Should Decertify The Class Because The Requirements Of Rule 23 Are Not Satisfied...............................................................................................9

II.     Facts Discovered During The Class Notice Process Demonstrate Individualized Issues On Arbitration And Consent To ICM's Terms Of Service Predominate Over Any Common Issues. ............................................................11

III.     New Legal Developments Confirm That Determining If An SEO Directory Class Member Has An IRPA Claims Requires An Individualized Determination. ...................16

     A.     The Seventh Circuit's *Huston* Decision Confirms IRPA Claims Require Publication For the Purpose Of Selling A Good Or Service. ...............................16

     B.     *Huston* Renders The IRPA Claims Unmanageable On A Class-Wide Basis.................................................................................................................17

IV.     The Statute Of Limitations Subclasses Are Unmanageable Under The Illinois Supreme Court's Ruling In *Tims*. ...................................................................19

CONCLUSION...........................................................................................................22

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ...................................................................................................11

*Blair v. Nev. Landing P'ship*,
    859 N.E.2d 1188 (Ill. App. Ct. 2006) ......................................................................19

*Bonilla v. Ancestry.com Operations Inc.*,
    ___ F. Supp. 3d ___, 2022 WL 4291359 (N.D. Ill. Sept. 16, 2022) ........................19

*Brodsky v. HumanaDental Ins. Co.*,
    269 F. Supp. 3d 841 (N.D. Ill. 2017) ..........................................................................9

*Dancel v. Group, Inc.*,
    949 F.3d 999 (7th Cir. 2019) .....................................................................................15

*Hinton v. Vonch, LLC*,
    No. 18 CV 7221, 2019 WL 3554273 (N.D. Ill. Aug. 2, 2019) ................................19

*Huston v. Hearst Communications, Inc.*,
    53 F.4th 1097 (7th Cir. 2022) .............................................................2, 16, 17, 20

*Johnson v. Yahoo! Inc.*,
    No. 14 CV 2028, 2018 WL 835339 (N.D. Ill. Feb. 13, 2018) ....................... *passim*

*Lipton v. Chattem, Inc.*,
    289 F.R.D. 456 (N.D. Ill. 2013) ................................................................................15

*McIntyre v. Household Bank*,
    No. 02 C 1537, 2004 WL 2958690 (N.D. Ill. Dec. 21, 2004) ..................................21

*Parkis v. Arrow Fin. Servs., LLS*,
    No. 07 C 410, 2008 WL 94798 (N.D. Ill. Jan. 8, 2008) ...........................................21

*Phillips v. Sheriff of Cook Cnty.*,
    828 F.3d 541 (7th Cir. 2016) .......................................................................................9

*Tims v. Black Horse Carriers, Inc.*,
    ___ N.E.3d ___, 2023 WL 1458046 (Ill. Feb. 2, 2023)..............................2, 19, 20

*Trannel v. Prairie Ridge Media, Inc.*,
    987 N.E.2d 923 (Ill. App. Ct. 2013) ....................................................................6, 16

**Statutes**

735 ILCS 5/13-201 ..................................................................................................................20

765 ILCS 1075/1 ....................................................................................................................5

**Other Authorities**

Fed R. Civ. P. 23 ............................................................................................... *passim*

# INTRODUCTION

The certification of a class is not set in stone, never to be revisited. Courts have a continuing duty to assure that a class complies with Federal Rule of Civil Procedure 23. As this Court previously held in a case that arose in nearly identical circumstances, where factual or legal developments demonstrate a certified class can no longer efficiently advance common claims, or members of the certified class are not similarly situated, decertification is proper. *Johnson v. Yahoo! Inc.*, No. 14 CV 2028, 2018 WL 835339, at *2 (N.D. Ill. Feb. 13, 2018).

That is the case here. Plaintiffs sued Instant Checkmate LLC ("ICM") under the Illinois Right of Publicity Act ("IRPA") and alleged ICM publicized their identities in connection with purported advertisements for ICM's services. Judge Feinerman certified Plaintiffs' "SEO Directory Class," defined as "All Illinois residents who were listed in ICM's SEO Directory" on the date this suit was filed and continuing until the date of class certification, "where such listing included that person's name, age, location(s), and relative(s), excluding anyone who has incurred actual damages as defined in IRPA." Dkt. 193 at 5. After class certification, three critical developments occurred.

***First***, while in granting certification the Court stated there was a lack of evidence on how many members agreed to arbitrate their claims, new information came to light when the parties began to investigate how to send notice to "Illinois residents," a term Plaintiffs (and the Court) did not define in the class certification briefing and ruling. After certification, Plaintiffs defined "Illinois residents" as anyone with any Illinois address in the Search Engine Optimization ("SEO") Directory. In attempting to devise a way to send notice to that class, ICM discovered that a significant percentage of the putative class—indeed, millions of individuals—may have agreed to arbitrate their claims. Moreover, class members who agreed to arbitrate cannot be identified

"mechanically," as the Court had hypothesized. Instead, it is a fact-intensive inquiry such that common issues of law or fact do not predominate.

**Second**, the Seventh Circuit recently clarified in *Huston v. Hearst Communications, Inc.*, 53 F.4th 1097 (7th Cir. 2022), that an IRPA claim requires actual publication at the time of or before the offer to sell goods or services. Applying this new decision makes clear that the majority of putative members of the certified SEO Directory Class do not have a claim because their identities have not been published at all, let alone for a commercial purpose. The individualized inquiries needed to decide which class members have a claim make the class unmanageable.

**Third**, the Court stated the applicable statute of limitations was an "open question" at the time of class certification. It certified a subclass going back one year from the filing of the complaint and a second subclass stretching back five years. Dkt. 193 at 13. The Illinois Supreme Court recently decided *Tims v. Black Horse Carriers, Inc.*, which clarifies the applicable statute of limitations for privacy claims based on publication, such as IRPA, is one year. ___ N.E.3d ___, 2023 WL 1458046, at *4 (Ill. Feb. 2, 2023). Not only should the Court decertify the five-year class, but it should also decertify the one-year class as there is no way to identify which class members have claims.

## BACKGROUND

### A.   ICM's Services

ICM operates a website where users can obtain background reports containing publicly available information about individuals. Dkt. 40 ¶¶ 1, 5. No content is displayed about anyone when a visitor goes to the website. Instead, visitors can search for free by inputting a first and last name. In response, the ICM website displays search results that may include some, but not necessarily all, of the following information: first and last name, age, associated locations, and possible

relatives. *Id.* at ¶¶ 1–5. Searches are performed using the "search" feature displayed prominently at the top of the landing page when the user opens the ICM website. *See* Ex. A.

When a user initiates a search on ICM's website, the website makes a real-time "application programing interface" or "API" call to ICM's third-party data providers, which provide aggregated publicly available data that potentially matches the search terms, a small portion of which is displayed to the user. Dkt. 167-15 ¶¶7–10. ICM does not keep records of the information displayed as search results. Dkt. 193 at 25 (quoting Dkt. 167-16 ¶7). Moreover, because the third party's data changes to reflect current information, prior search results cannot be recreated. *Id.* (ICM submitted a video, found at Dkt. 169, demonstrating how a search on the website works and the information displayed to the user.)

While not mentioned at all in the complaint, the class certification ruling shifted the focus of this case to the SEO Directory, which is a separate part of ICM's website. ICM maintains an SEO Directory that can be accessed from the landing page. The link to the SEO Directory is not prominently displayed on the landing page as it was not designed as the way for users to query ICM for background reports. A user who clicks the SEO Directory link is directed back to the website's search function. (The way to access the SEO Directory on the website is highlighted at the bottom of the screenshot in Exhibit A.) The SEO Directory was designed to optimize ICM on search engine websites (like Google) by making ICM more attractive to search engine algorithms. Dkt. 167-15 ¶15. The SEO Directory increases the likelihood that when a user searches for an individual, ICM's site will appear among the top search results. The SEO Directory is comprised of data related to millions of individual profiles that may contain first and last names, ages, associated locations, and/or possible relatives though not all contain information for all of these fields. *Id.* at ¶¶17–18. The associated locations field does not necessarily identify an individual's

residence, let alone last known residence. Dkt. 208 at 12. Indeed, the SEO Directory profile often references multiple addresses including "investment property, a business address, a relative's address, or an address associated with another location where the profile subject never resided." *Id.* at 11.

SEO Directory listings are created in two primary ways. First, the majority of data arrives in the SEO Directory as a result of searches run on third-party partner websites. Dkt. 167-15 ¶20. When a person searches for a name on a partner site, the site will use ICM's API to send a signal to ICM's data providers. *Id.* While the information that will be displayed on the partner site only include a small fraction of the data returned from that call, ICM stores all the data sent by its data providers in the SEO Directory. *Id.* Second, the SEO Directory incorporates data from searches run on ICM's own website. Like the searches on partner sites, ICM's website only displays a small percentage of the data from the data providers. *Id.* at ¶22.

ICM does not publish profiles in the SEO Directory to search engines. *Id.* at ¶19. Rather, ICM provides the search engines with raw, disaggregated data. *Id.* Whenever someone searches for a person's name on a search engine like Google, the search engine will use its proprietary algorithms based on the user's search terms to determine how high ICM's website should be displayed in its own search results. *See id.* Notably, ICM cannot determine if any profiles in the SEO Directory have ever been displayed in a search result, or if data in a specific SEO profile has ever been displayed on any website. *Id.* at ¶¶26–27. The majority of profiles in the SEO Directory are created through searches on partner sites, and only a small percentage of data provided by ICM's data providers and included in the SEO Directory is ever publicized, let alone associated with a commercial offer. *Id.* at ¶27.

## B.     Proceedings Regarding the Complaint

Plaintiffs brought claims against ICM under IRPA, 765 ILCS 1075/1, seeking statutory damages and injunctive relief. Dkt. 109 ¶¶56–62. Plaintiffs allege that when ICM provides search results on its website—which include a profile including a name, age, associated locations, and possible relatives—it uses these results to advertise its monthly subscription services. *Id.* at ¶¶7–16. Plaintiffs allege that the profiles include their identities, without their consent. *Id.* at ¶17. The Complaint focuses on ICM's search results. It does even not mention the SEO Directory.

## C.     Class Certification

Plaintiffs moved to certify two damage classes under Rule 23(b)(3). Dkt. 148. First, Plaintiffs sought to certify a "Search Results Class" of individuals whose name, age, location, and relatives had appeared in a search result on ICM's website" during a specific time period. *Id.* at 10. Second, Plaintiffs moved to certify a SEO Directory Class, which they defined as "All Illinois residents who were listed in ICM's SEO Directory" from the date suit was filed through the date of certification "where such listing included that person's name, age, location(s), and relative(s), excluding anyone who has incurred actual damages as defined in IRPA." Dkt. 193 at 31–32.

In opposing certification, ICM argued, among other things, that members of the proposed classes who had agreed to ICM's Terms of Use had agreed to binding arbitration. Beginning on November 13, 2020, they also consented to the "use and display" of their information if they searched for themselves on ICM's website (or had someone do so on their behalf). Dkt. 167 at 12–16. Identifying individuals who agreed to arbitrate or consented to the display of their information is an individualized issue that would predominate over common questions. *Id.* ICM also argued that the Search Results or SEO Directory Class was not manageable because there was no way to tell whose information had been displayed in the past in a particular search or otherwise publicly

held out. *Id.* at 25. ICM further argued that a large number of the class members (and at least one of the named plaintiffs) were barred by the one-year statute of limitations. *Id.* at 18.

Judge Feinerman declined to certify the Search Results class because ICM "'does not store the information that was displayed in the selected search result' and 'cannot recreate the information that was displayed in a specific selected search result.'" Dkt. 193 at 25 (quoting Dkt. 167-16 ¶7). As Judge Feinerman noted, ICM's search results are not frozen in time but are "constantly changing or being updated." *Id.* at 26 (quoting Dkt. 167-17 ¶9). He determined that the available data would only show "a putative class member's search result has an associated name, age, location(s), and relative(s) today," which has nothing to do with the class definition, "which requires those attributes to have been used in the past." *Id.*

Judge Feinerman certified the SEO Directory class. He found that an IRPA violation did not require display of the class member's identity and, therefore, simply including an individual's identity in the SEO Directory established an IRPA claim. *Id.* at 27. He also found that even though the SEO Directory did not indicate where an individual currently resides, this could be resolved through affidavits during the claim administration process.[1] *Id.* at 26–27.

In his opinion, Judge Feinerman addressed three issues ICM raised, two of which he noted would need to be addressed later. First, on the arbitration and consent issues, he determined that there was not "sufficient particularized evidence" regarding how many class members may be subject to the Terms of Use. *Id.* at 18–20. He suggested ICM could "mechanically resolve" the issue at a later date by consulting its records. *Id.* at 20. Second, regarding the elements of IRPA claims, he read *Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923 (Ill. App. Ct. 2013), to hold

---

[1] The Court also certified an "Injunctive Relief Class" under Rule 23(b)(2) defined as "All Illinois residents for whom Instant Checkmate can generate a name, age, and or more location(s) and relative(s)" in either the SEO Directory or ICM's Search Results. Dkt. 193 at 32. ICM does not seek to decertify the Injunctive Relief Class on these bases.

there need not be any display of the class members' identity to violate IRPA. Dkt. 193 at 21–22. Finally, he determined the applicable limitations period for IRPA claims was "an open question" that could be decided later. *Id.* at 13. For now, he divided the SEO Directory Class into a one-year subclass and a five-year subclass. *Id.* at 32.

## D.     Developments After Class Certification

The Court directed the parties to develop a plan to give notice to the SEO Directory Class. (Notice still has yet not been sent.) It was here that problems raised during class certification became fully apparent. Plaintiffs asked ICM to provide: (1) information regarding ICM's ability to identify an address for a particular person in the SEO Directory; (2) what information the SEO Directory had with respect to class members' identification and contact information; and (3) data on the total number of individuals in the SEO Directory Class. *See* Dkt. 200 at 1. Plaintiffs also asked for email addresses to provide notice. *Id.* at 2.

In response, ICM informed Plaintiffs that it could not identify "Illinois residents," only those with profiles in the SEO Directory "with an Illinois address among the listed addresses." *Id.* It added that "having an Illinois address listed does not mean that person ever has lived in Illinois." *Id.* Because the SEO Directory pulls in large volumes of data, the addresses could include "investment property, a business address, a relative's address, or an address associated with another location where the profile subject never resided." Dkt. 208 at 11; *see, e.g.*, Dkt. 167-17 (Fischer Dep.) at 211:21–24 (two locations associated with one class representative were incorrect); Dkt. 167-20 (Lukis Dep.) at 157:6–21 (one address associated with a second class representative was incorrect). ICM also confirmed the SEO Directory does not include information that would indicate a profile's "last known address." Dkt. 208 at 12. As for emails, ICM noted many email addresses are associated with multiple profiles and the same email addresses associated with SEO Directory profiles were found in ICM's user records. *Id.* at 12–13. If an email

address is in ICM's user records, that means someone entered that email address when registering for an ICM account and necessarily agreed to ICM's Terms of Use, including its arbitration clause. *Id.* In addition, since 2020, users consented to the use and display of their identifying information when searching for information about themselves. Dkt. 210 ¶¶5–13; *see also* Dkt. 142 at 1–3; Dkt. 142-7 ¶¶4–8; Dkt. 142-11 ¶¶4–7; Ex. B (A. Johnson Decl.) ¶¶5–8.

And importantly, ICM is unable to determine if any of the information about an individual in the SEO Directory has ever been publicized on its website. Finally, ICM confirmed it cannot determine when a profile first appeared in the SEO Directory or when certain information was added to a profile. *See* Dkt. 208 at 11.

Applying Plaintiffs' definition of an Illinois resident, ICM determined that there were 17,837,039 profiles of "class members" in the SEO Directory with at least one Illinois addresses —more than the population of the state. Ex. B ¶17; *see* Dkt. 200 at 2; Dkt. 208 at 12. Moreover, after comparing the SEO Directory records Plaintiffs requested to ICM's user records, ICM learned that:

- Of the 17.8 million SEO Directory profiles with an Illinois address, more than 12.6 million had at least one email address, with an average of 3.94 email addresses per profile. Dkt. 200 at 2; Dkt. 208 at 13; Ex. B ¶19.

- Of the 17.8 million profiles, ███████ profiles match the first and last name of at least one user registered in ICM's records. *Id.* at ¶27.

- Of the 17.8 million profiles, ██████ profiles contain an email that matches a user registered in ICM's records. *Id.* at ¶¶23, 25. Controlling for emails associated with multiple profiles, there are still ██████ unique emails in SEO profiles that match an email in ICM's user records. *Id.* at ¶24.

- Recognizing some SEO Directory profiles match ICM's user records through both email and names, ICM identified ██████ profiles that match its users records through either email, name, or both. *Id.* at ¶32. In other words, ICM records contain some evidence that more than ███ of the profiles may have agreed to arbitrate their IRPA claims. *Id.* at ¶ 32.

Proceedings in this case were held in abeyance, by agreement of the parties and approval of the Court, while the parties pursued of settlement and reported their progress to the Court. Dkt. 222 (Aug. 25, 2022) (order staying notice pending mediation); s*ee, e.g.*, Dkt. 227 (Nov. 11, 2022); Dkt. 229 (Dec. 12, 2022); Dkt. 234 (Jan. 19, 2023); Dkt. 236 (Feb. 21, 2023). The Court's recent order indicated that if a settlement was not imminent (which is it not though the parties continue to talk), the Court wanted to set a notice schedule, ICM is submitting this motion now because it should be resolved before Plaintiffs incur the cost of notice, which Plaintiffs estimate will cost more than $1 million.

## ARGUMENT

### I.      The Court Should Decertify The Class Because The Requirements Of Rule 23 Are Not Satisfied.

This motion implicates Rule 23's requirement that a Court has a continuing duty—through final judgment—to ensure that all requirements of Rule 23 are satisfied. Fed R. Civ. P. 23 (c)(1)(C). Decertification of a class is appropriate when the Court determines that the requirements of Rule 23 are not met "in [] light of subsequent developments in the litigation." *Brodsky v. HumanaDental Ins. Co.*, 269 F. Supp. 3d 841, 845 (N.D. Ill. 2017) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554–58 (7th Cir. 2016). Subsequent factual and legal developments may prompt decertification where the Court concludes the circumstances of the case are substantially different than the Court understood at class certification.

This Court recently applied these principles in *Johnson v. Yahoo! Inc.*, No. 14 CV 2028, 2018 WL 835339, at *2 (N.D. Ill. Feb. 13, 2018), in which it decertified a class the Court had previously certified based on new information. In *Johnson*, the plaintiffs sued Yahoo! under the Telephone Consumer Protection Act for sending an automated text message. *Id.* at *1. The Court

initially certified a class of users, not subscribers, of Sprint telephone numbers who received this automated message so long as that phone number was not associated with a Yahoo! account. *Id.* at *2. The Court rejected Yahoo!'s argument that individualized issues of consent to its terms of service would predominate, holding there was insufficient evidence on the issue. *Id.* After certification, the parties subpoenaed Sprint, which produced a list of users and subscribers who received the automated message. *Id.* Yahoo! compared the list from Sprint with its own records and discovered that between 20 and 25% of the putative class members had phone numbers associated with Yahoo! accounts. *Id.* at *3. Even though the period for discovery had closed, the Court decertified the class. *Id.* at *4. The Court acknowledged that to determine consent, "the facts surrounding each person associated with a matching number would have to be explored. This could not be done in a single proceeding through records and an expert witness because the requisite identity-match may be dependent on class member testimony." *Id.* at *3. Therefore, Yahoo!'s arguments about the individualized inquiries of consent were no longer "vague assertions" because there was "evidence sufficient to justify an individual consent inquiry for a significant percentage of the class." *Id.* at *2–3. As a result, the Court decertified the class. *Id.* at *4.

As in *Johnson*, subsequent developments reveal that the previously certified SEO Directory class does not satisfy Rule 23. As shown in the remainder of this brief, the new developments reveal three reasons why the SEO Directory Class is amorphous, unmanageable, and beset with individual issues:

***First***, the reason Judge Feinerman rejected ICM's argument that deciding which individuals agreed to the Terms of Use would predominate over any common issues has been disproven. There now is evidence that ███████ of the SEO Directory profiles associated with Illinois addresses may have accepted ICM's Terms of Use. Identifying which class members

actually agreed to arbitrate or consented, however, is a complex process that will consume this case. It is no longer a mere possibility that these issues will predominate the class—it is a certainty.

**Second**, the Seventh Circuit's recent decision in *Huston* clarified IRPA requires a plaintiff to prove his or her identity was displayed at some point before or at the time of the commercial offer.

**Third**, the Illinois Supreme Court's recent ruling in *Tims* and decisions from this and other courts confirm that IRPA claims are subject to a one-year limitations period. These decisions void the five-year subclass. It also illustrates the unmanageable nature of the one-year subclass as there is no feasible way to determine which putative class members are within the subclass.

## II. Facts Discovered During The Class Notice Process Demonstrate Individualized Issues On Arbitration And Consent To ICM's Terms Of Service Predominate Over Any Common Issues.

The notice process has revealed that potentially millions of members of the SEO Directory Class have accepted ICM's Terms of Use. Figuring out if a class member accepted the Terms of Use presents individualized issues that preclude certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997) (common issues of law and fact must predominate over individualized issues); *Johnson*, 2018 WL 835339, at *2 (citing *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (7th Cir. 2008)).

In addressing the issue in the class certification ruling, Judge Feinerman suggested any issues regarding the validity or effect of the Terms of Use could be resolved in one fell swoop. Dkt. 193 at 18–19. He stated ICM had not provided "sufficient particularized evidence" with respect to how many putative class members may have agreed to arbitrate their claims and the issue could be resolved at a later time, perhaps by "mechanically" culling the class. *Id.* at 19–20. Now that the parties have learned new facts in the process of developing a class notice protocol, the evidence demonstrates certification is improper.

The facts developed since class certification demonstrate that a large percentage of the members of the SEO Directory Class have accepted ICM's Terms of Use, and with those terms, agreed to arbitrate and in some cases even consented to the display of their identities on ICM's website. Identifying those members who agreed to arbitrate rather than litigate their claims presents an intractable problem.

ICM identified 17.8 million profiles in the SEO Directory that are associated with an Illinois address. Dkt. 200 at 2; Dkt. 208 at 12. When ICM compared the emails and names of these profiles with its user records, nearly ███████████ of these profiles matched with a record of an individual who agreed to ICM's Terms of Use. Ex. B ¶32. The nature of the overlap between the SEO Directory Class and ICM's user records, and the limitations of those records, defeat any attempt to identify which class members consented to ICM's Terms of Use in a mechanical way.

To determine whether class members with email addresses and names matching ICM's user records accepted the Terms of Use, and thereby consented to arbitration, "the facts surrounding each person associated with a matching [email and/or name] would have to be explored." *Johnson*, 2018 WL 835339, at *3. "This [cannot] be done in a single proceeding through records and an expert witness because the requisite identity-match may be dependent on class member testimony. *Id*.

The average SEO Directory profile is associated with approximately 4 email addresses. Dkt. 208 at 13. And of the ████████ unique email addresses contained in SEO profiles that match an ICM user record, ████████ of them are shared by more than one SEO profile. Ex. B ¶24. Some of the email addresses that match may not be correct. *See* Ex. B ¶¶ 13–14; Dkt. 167-17 at 211:21–24; Dkt. 167-20 at 157:6–21. Moreover, the email addresses in each SEO profile are not necessarily current or exhaustive. *See* Ex. B ¶¶19–21.

The name matches present another difficulty problem due to, among other things, the problem of reconciling common names. The SEO profile records must be compared to ICM user data records to attempt an identity match. The ICM user records also are incomplete, as many ICM users input inaccurate identity information and other ICM users consent to the Terms of Use without providing any information. *See* Ex. B ¶¶13–14.

These individualized issues are not hypothetical. Several examples based on ICM's review confirm the complexity of attempting to match SEO profile records against ICM user records:

- Even where there is a name match, it is often not possible to determine if a class member consented to ICM's Terms of Use from just ICM's records; information will be needed from the putative class member. For example, out of 17.8 million SEO Directory Profiles with an Illinois address, there are only two individuals named "███████████." Ex. B ¶31(f). There is only one "███████████" among the ███ ICM users. Ex. B ¶¶11, 31(f). The uniqueness of this name suggests the ICM user record should correspond to at least one of the SEO profiles. But none of the email addresses in the SEO profile records match the email in the user record. Ex. B ¶31(f). It could be that the SEO profile email addresses are not exhaustive or current or ███ ████ inputted an incorrect email address. Or it could be that the records refer to different people. Even in this simple case, it is not possible to determine without a factual inquiry whether a ███████████ in the SEO directory accepted the Terms of Use.

- There is an SEO profile with the name "███████████" and the email address "███████████." Ex. B ¶25(b). That email address matches an ICM user record that uses the fake name "███████████." *Id.* It cannot be determined from ICM's records if "███████████" a family address used by multiple persons or whether ███████████ or someone else used that email address when consenting to the Terms of Use. ICM's records cannot answer whether that email address even belong to the ███ ████████ identified in that SEO profile. Again, even this seemingly straightforward example requires information from her to determine if she agreed to the Terms of Service.

- There is an ICM user record of "███████████" with the email address ███████████. Ex. B ¶25(f). That single email address is included in numerous SEO profiles of people with the last name ████. *See id.* Determining whether email address was shared by several members of the ███████ family and whether the ████████████ of the ICM user record is the same ████████, ████████, ██, or some other ████████ in the SEO profile record also requires information from the individual potential class member to resolve.

- There are 1,786 unique SEO profiles and ███ ICM user records using the ███████ ███. Ex. B ¶28. Determining which of those SEO profiles match which ICM user records will consume this case.

Comparing email addresses in the SEO profiles to ICM's user records is only the first step. Even if there is no match, the parties' experience with former Plaintiff Adams shows other evidence may demonstrate an individual's acceptance of the Terms of Use, which is a time-consuming, fact-intensive exercise. *See* Dkt. 161 at 10–12. And many users consent to the Terms of Use without providing a name or email address. Ex. B ¶12. When Judge Feinerman compelled Plaintiff Adams to arbitrate her claims against ICM, he stated that to determine whether a putative class member agreed to arbitration is a "fact-intensive inquiry." Dkt. 161 at 10. Moreover, in that instance, the parties did not contest that the new named plaintiff created an ICM account. *Id.* at 2. That will not be the case for every class member. Many class members would argue that they did not create the account but that someone else used their email address without their consent or that it was someone else with the same name who used ICM's website and, therefore, they are not bound by the Terms of Use.[2]

The extent of the overlap between the SEO Directory Class and the user records did not arise until after the Court certified the class. In briefing class certification, Plaintiffs sought to certify a class of Illinois residents, but they did not explain how they would define "residents." ICM argued that it did not have residence information. While Judge Feinerman did not see that issue as a reason to deny certification, he did not explain what was meant by "resident" in the certification order. When the parties began to address notice, Plaintiffs for the first time suggested

---

[2] Matching SEO Profiles to ICM user records will be necessary to determine who consented to the use and display of identifying information by running a self-search under the 2020 revision of ICM's Terms of Use. As there are multiple profiles with the same or similar names, determining how many putative class members in fact consented to the 2020 revision of the Terms of Use would require an individualized inquiry for each of them.

that a "resident" was someone with even one Illinois address in an SEO Directory profile. That position—first raised by Plaintiffs on April 11, 2022 (two weeks after the Court certified the class)—triggered the investigation that has revealed this issue and the corresponding facts.

This case's parallels to *Johnson* are stark. Both cases involve evidence that emerged after class certification that recontextualized the complexity of the acceptance of Terms of Use as relevant to certification. Both cases involve evidence that a significant percentage of the class likely consented to binding terms based on matching identifying information between a class list and user records. *Johnson* involved names and phone numbers, while this case involves names and emails. Both cases would require an investigation into the facts surrounding each person to determine whether each class member did in fact consent to binding terms. The outcome of this case should be the same as *Johnson*—decertification of the SEO Class is warranted.

The sheer volume of class members who may be subject to ICM's Terms of Use and the difficulty in matching SEO Profiles to ICM users undermines the notion that the SEO Directory Class involves common issues of law and fact that predominate. Instead, members of the SEO Directory Class "will need to present evidence that varies from member to member" to determine whether they are subject to arbitration. *Dancel v. Group, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019) (quoting *Tyson Foods, Inc. . Bouaphakeo*, 577 U.S. 442, 453 (2016)); *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 461–62 (N.D. Ill. 2013) (where determinations are "individual and fact-intensive," certification under Rule 23(b)(3) is improper). Because these fact-specific questions control such a "significant percentage of the class," decertification is proper. *Johnson*, 2018 WL 835339, at *3 (20 to 25% of the putative class was a "significant percentage").

### III.   New Legal Developments Confirm That Determining If An SEO Directory Class Member Has An IRPA Claims Requires An Individualized Determination.

The Seventh Circuit's recent decision in *Huston* confirms that determining whether a class member has an IRPA claim requires an individualized determination. IRPA attaches liability to the "public use" or "holding out" of a person's identity for a commercial purpose. In certifying the SEO class, Judge Feinerman grappled with the decision of the Illinois Appellate Court interpreting IRPA in *Trannel*. There, the defendant published a photo of the plaintiff and her daughter in an issue of a magazine with their consent, but then later used that same photo in a media kit to promote the magazine to advertisers. *Trannel v. Prairie Ridge Media, Inc.*, 987 N.E.2d 923, 926–27 (Ill. App. Ct. 2013). The Illinois Appellate Court determined that sending out the media kits violated IRPA because the defendant "held out" the plaintiffs' identities for a commercial purpose without their consent. *Id.* at 930. Applying *Trannel* in the certification decision, Judge Feinerman found that the inclusion of a profile in the SEO Directory constituted "holding out" even if the information was never displayed. Dkt. 193 at 21–22. That reading cannot stand today given the Seventh Circuit's recent decision in *Huston*.

### A.   The Seventh Circuit's *Huston* Decision Confirms IRPA Claims Require Publication For the Purpose Of Selling A Good Or Service.

The Seventh Circuit's decision in *Huston* rejects Judge Feinerman's reading of *Trannel* and confirms IRPA's "held out" prong requires Plaintiffs' identities must be displayed to sell something. In *Huston*, the plaintiff sued a magazine publisher under IRPA for selling a mailing list that included her name, address, age, and other personal information. 53 F.4th at 1099. In affirming the dismissal of the complaint, the Seventh Circuit determined the plaintiff failed to allege that the magazine publisher "solicited mailing list purchasers by publicizing her information." *Id.* at 1100. IRPA "prohibits the use or holding out of a person's identifying information to *offer to sell or sell* a product, piece of merchandise, good, or service." *Id.* at 1101

(emphasis in original) (citing 765 ILCS 1075/5). Therefore, "any use or holding out must either accompany an offer to sell or precede the sale." *Id.* (citing *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 907 (7th Cir. 2005)).

The Seventh Circuit in *Huston* found that "[t]here [was] no corollary to the media kit in [*Trannel*]. [The plaintiff's] identity was not placed on the cover of the mailing list or held out to aid, effectuate, or propose a commercial transaction." *Id.* at 1101–02. Moreover, even if her identity had been published that would not be enough for the Court: "[h]er identity must [also] help sell something—whether it is that product or a separate product or service." *Id.* at 1102. The *Huston* decision makes clear that IRPA requires that a plaintiff's identity must be published or revealed in some form for the purpose of selling some product or service at the time or before the offer to sell.

**B.    *Huston* Renders The IRPA Claims Unmanageable On A Class-Wide Basis.**

During class certification, ICM warned that the SEO Directory Class was unmanageable because ICM cannot track or identify if any SEO Directory profiles have ever been displayed on an ICM search result page or in a search result on a partner website, let alone for selling its goods and services, or if the data has remained in cold storage. Dkt. 167-15 ¶¶26–27. The search results display only a small portion of the data from ICM's data provider that are imported into the SEO Directory.  As a result, the majority of the information in the SEO Directory has never been published. *Id.* at ¶ 27. ICM cautioned that administrating a class of SEO Directory profiles would prove impossible.

The parties' efforts since class certification have borne out this concern. The sheer number of profiles at issue, 17.8 million, presents the scope of the problem. The only identifying information ICM saves when a user selects an SEO Profile is a first name, last name, city and state from the SEO profile. Ex. B ¶ 15. The city and state that are included in the SEO profile may not

ever have been the individual's residence let alone the last known residence. *Id.* This information is not sufficient to identify a specific individual because there are almost always multiple profiles with the same name, and SEO profile information, including location, changes over time. If a user were to select an SEO Profile, the user is then directed immediately to the Search Results Page. A user may select a profile on the Search Results page that is different from the profile selected in the SEO Directory. And, in any event, as ICM established during class certification, it cannot even determine which profiles were actually presented, or held out, to a user.

Thus, trying to determine if the profiles from the SEO Directory have been publicized for the purpose of selling ICM's goods and services, as required under *Trannel* and *Huston*, is an insurmountable hurdle. At most, the parties know that the majority of these profiles have never been displayed, let alone in connection with a commercial offer.

This is the type of individualized determination that Judge Feinerman concluded precluded the certification of the Search Results Class. There, he held that determining the members of the class was not possible because it was unknown what was shown in past search results. He reached a different conclusion with respect to the SEO Directory Class because he believed that class could prove its case simply due to its inclusion in the SEO Directory. *Huston* demonstrates that the Court's prior distinction is incorrect. Just as including a name in a mailing list, without more, does not violate IRPA, the same is true for including a name in the SEO Directory without publishing that information in a commercial offer. For the same reasons that Judge Feinerman rejected the Search Results Class, the SEO Directory Class also resists class-wide resolution. *See, e.g.*, *Johnson*, 2018 WL 835339, at *3 (new evidence of users and accountholders indicated that individualized questions of consent predominated the case, requiring decertification). Without any

method of avoiding the fact-intensive examinations necessary to establish an IRPA claim, the SEO Directory Class is unmanageable and must be decertified.

## IV.    The Statute Of Limitations Subclasses Are Unmanageable Under The Illinois Supreme Court's Ruling In *Tims*.

The statute of limitations subclasses are unmanageable as made clear by the Illinois Supreme Court's recent decision in *Tims*. When Judge Feinerman faced the issue of whether members of the class—including at least one of the named plaintiffs—were barred from pursuing their IRPA claims under a one-year statute of limitations, he noted that the statute of limitations for IRPA "is an open question." Dkt. 193 at 13. The one Illinois appellate court to address the issue determined IRPA is subject to one-year statute of limitations. *Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1192 (Ill. App. Ct. 2006). Relying on *Blair*, some federal district courts have applied a one-year time bar while noting the lack of clarity from state courts on the issue. *See, e.g.*, *Hinton v. Vonch, LLC*, No. 18 CV 7221, 2019 WL 3554273, at *2 (N.D. Ill. Aug. 2, 2019) (citing *Martin v. Living Essentials, LLC*, 653 F. App'x 482, 486 (7th Cir. 2016)) (noting IRPA's statute of limitations remains an open issue but finding *Blair* persuasive); *Bonilla v. Ancestry.com Operations Inc.*, ___ F. Supp. 3d ___, 2022 WL 4291359, at *2 (N.D. Ill. Sept. 16, 2022) ("The Illinois Supreme Court has never addressed the appropriate length of time to file a claim under [IRPA]," but federal courts have applied *Blair* because it remains "the only on-point decision" from Illinois state courts). In the class certification ruling, the Court deferred the issue and created a one-year limitations subclass and a five-year limitations subclass. Dkt. 193 at 32.

Recently, the Illinois Supreme Court clarified that the statute of limitations for publication-related claims is one year. *Tims*, 2023 WL 1458046, at *6. While the Supreme Court focused on the Biometric Information Privacy Act ("BIPA"), *see id.*, its discussion of the BIPA limitations period provides insight on privacy claims more generally.

Illinois sets a one-year statute of limitations for actions that involve "publication of matter violating the right of privacy." 735 ILCS 5/13-201. In *Tims*, the Illinois Supreme Court noted that while certain portions of BIPA involved publication and thus could trigger a one-year limitation, other portions of BIPA did not include any "words that could be defined as involving 'publication,' nor could an inference of publication be drawn from any of the words in those subsections," to which a five-year limitation would apply. *Tims*, 2023 WL 1458046, at *6. The *Tims* Court ultimately decided that only one limitations period should apply to BIPA, and applying Illinois public policy, it held that the five-year limitation governed the entire statute. *Id.* at *7–8.

IRPA does not present the same complications as BIPA. IRPA claims are only actions "for publication of matter violating the right of privacy"—the statute codified and abrogated the tort of appropriation of another's name or likeness and the common law right of publicity. *Huston*, 53 F.4th at 1099. If the limitations period for IRPA claims was once an "open question," *Tims* resolves that a one-year limit applies to privacy claims based on publication.

This new clarity in the law has two consequences. First, the Court should decertify the five-year subclass. As ICM argued in opposing the initial certification, a class should not be certified to encompass claims that fail as a matter of law. *See* Dkt. 167 at 19–20.

Second, the application of a one-year statute of limitations, combined with Judge Feinerman's reasoning in rejecting the Search Results Class, confirms the house of cards that comprises the SEO Directory Class cannot stand. Whether there are two subclasses split between the one- and five-year statute of limitations or just one class subject to the one-year limit, Plaintiffs cannot avoid the fact that the parties cannot provide any information about when a particular profile was added to the SEO Directory. Dkt. 208 at 11. We know at least one of the named

Plaintiffs falls outside the one-year limitations period. *See* Dkt. 193 at 13. Given the limitations of the SEO Directory, there is no telling how many other putative class members are time-barred.

Regardless of the relevant limitations period, no one can tell when a particular profile first appeared in the SEO Directory. Dkt. 208 at 11. Because no one can determine when a profile appeared in the SEO Directory, the SEO Directory Class lacks any chance of ever being manageable. *See Parkis v. Arrow Fin. Servs., LLS*, No. 07 C 410, 2008 WL 94798, *4 (N.D. Ill. Jan. 8, 2008) (denying class certification because determining whether claims are time-barred would require individualized determinations); *McIntyre v. Household Bank*, No. 02 C 1537, 2004 WL 2958690, at *10 (N.D. Ill. Dec. 21, 2004) (same). Lacking any feasible way to determine the members of the SEO Directory Class without extensive individual proceedings, the SEO Directory Class should be decertified. The same defect persuaded Judge Feinerman to reject the Search Results Class, and that same result should be reached here with respect to the SEO Directory Class.

## CONCLUSION

For the foregoing reasons, this Court should grant ICM's Motion for Decertification of the

SEO Directory Class and decertify the SEO Directory Class.

Dated: March 27, 2023

Respectfully Submitted,

INSTANT CHECKMATE LLC

By: */s/ Debbie L. Berman*

Ian Heath Gershengorn (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Telephone: 202 639-6000
Facsimile: 202 639-6066
igershengorn@jenner.com

Debbie L. Berman, #6205154
Wade A. Thomson, #6282174
Clifford W. Berlow, #6292383
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: 312 222-9350
Facsimile: 312 527-0484
dberman@jenner.com
wthomson@jenner.com
cberlow@jenner.com

*Attorneys for Defendant Instant Checkmate
LLC*

## CERTIFICATE OF SERVICE

I, Debbie L. Berman, certify that on March 27, 2023, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a Notice of Electronic Filing to all counsel of record.


*/s/ Debbie L. Berman*
Debbie L. Berman